T.C. Memo. 1997-150


UNITED STATES TAX COURT


HARVEY M. PERT, TRANSFEREE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

KATHLEEN M. PERT, F.K.A. KATHLEEN M. RIFFE, TRANSFEREE,
Petitioner <u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 13783-94, 13784-94.          Filed March 24, 1997.


<u>B. Gray Gibbs</u>, for petitioners.

<u>Michael A. Pesavento</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

COLVIN, <u>Judge</u>:  Kathleen M. Pert (Mrs. Pert), formerly known
as Kathleen M. Riffe, was married to Timothy C. Riffe (Mr. Riffe)
until he died, and later married to Harvey M. Pert (Mr. Pert).

Mr. Riffe and Mrs. Pert filed joint income tax returns from 1986 to 1989.

Respondent determined that Mrs. Pert is liable as a transferee of the assets of Mr. Riffe for his and Mrs. Pert's unpaid income tax and interest and Mr. Riffe's additions to tax from 1986 to 1989.  Respondent also determined that Mr. Pert is liable for Mr. Riffe's and Mrs. Pert's income tax and Mr. Riffe's additions to tax as a successor transferee of the assets of Mr. Riffe, or as a transferee of the assets of Mrs. Pert.

Mr. Riffe's and Mrs. Pert's
Unpaid Joint Federal Income Tax Liabilities

| Tax Period Ending | Tax | Fees and Collection Costs | Assessed Interest | Payments Made | Unpaid Balance |
|---|---|---|---|---|---|
| 1986 | $37,342 | $ 12 | $25,158 | $43,976 | $18,524[1] |
| 1987 | 19,991 | 12 | 12,885 | 0 | 32,888 |
| 1988 | 14,684 | 0 | 6,574 | 5,000 | 16,260 |
| Total Unpaid Income Tax Liability | | | | | $67,672 |

[1]Respondent determined these amounts without explaining apparent math discrepancy.

Mr. Riffe's Unpaid Additions to Tax

| Tax Period | Fraud | Substantial Understatement | Negligence | Accuracy | Total |
|---|---|---|---|---|---|
| 1986 | $42,869 | $9,335 | $ 0 | $ 0 | $52,204 |
| 1987 | 0 | 4,998 | 7,443 | 0 | 12,441 |
| 1988 | 0 | 3,205 | 734 | 0 | 3,939 |
| 1989 | 0 | 0 | 0 | 3,819 | 3,819 |
| Total | $42,869 | $17,538 | $8,177 | $3,819 | $72,403 |

Mr. Riffe's unpaid income tax from 1986 to 1989 is $140,075. Mr. Riffe's liability is larger than Mrs. Pert's liability

because it includes additions to tax and penalties pursuant to a stipulated decision for 1987 and closing agreements for 1986, 1988, and 1989.

In Pert v. Commissioner, 105 T.C. 370, 377, 380 (1995), we held that petitioners could not dispute the tax liabilities of Mr. Riffe and Mrs. Pert because she signed closing agreements for 1986, 1988, and 1989 and agreed to a stipulated decision for 1987.  We also held that the statute of limitations does not bar respondent from assessing transferee liability against petitioners for 1986.  Id. at 379.

We must decide the following issues:

1.  Whether Mrs. Pert is liable as a transferee of Mr. Riffe's assets for his unpaid income tax and additions to tax for 1986, 1987, 1988, and 1989.  We hold that she is.[1]

2.  Whether respondent failed to prove the value of the property transferred from Mr. Riffe's estate to Mrs. Pert, as petitioners contend; the value of assets transferred is $399,535, as respondent contends; or the value is some other amount.  We hold that the value of assets transferred is $399,535.

---

[1] In light of our holding, we need not decide respondent's contentions that Mrs. Pert is liable as a fiduciary of Mr. Riffe's estate for Mr. Riffe's unpaid income tax and additions to tax for 1986, 1987, 1988, and 1989, and that Mrs. Pert is liable for Mr. Riffe's unpaid income tax and additions to tax for 1986, 1987, 1988, and 1989, because she signed a statement filed with the probate court in which she said that she would pay respondent the taxes which may become due from Mr. Riffe's estate.

3.  Whether Mr. Pert is liable as a successor transferee of Mr. Riffe's assets for Mr. Riffe's unpaid income tax and additions to tax for 1986, 1987, 1988, and 1989.  We hold that he is.

4.  Whether Mr. Pert is liable as a transferee of Mrs. Pert's assets for Mrs. Pert's unpaid income tax for 1986, 1987, 1988, and 1989.  We hold that he is.

5.  Whether respondent failed to prove the value of the assets that Mrs. Pert transferred to Mr. Pert from Mr. Riffe's estate, as petitioners contend; the value is $222,206, as respondent contends; or the value is some other amount.  We hold that the value of assets transferred to Mr. Pert is $126,112.

6.  Whether respondent properly credited tax payments that Mrs. Pert made on June 27 and December 11, 1991.  We hold that respondent did.

7.  Whether we should enter decision in Mrs. Pert's favor because the U.S. Bankruptcy Court for the Middle District of Florida discharged Mrs. Pert's liability as a transferee in a previously filed bankruptcy.  We hold that we should not.

Unless otherwise noted, section references are to the Internal Revenue Code of 1986 as in effect during the years in issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

FINDINGS OF FACT

A. <u>Petitioners</u>

Mr. and Mrs. Pert lived in Palm Harbor, Florida, when they filed their petitions.

B. <u>Transferor Timothy C. Riffe</u>

Mr. Riffe died on February 11, 1991. Decedent and Mrs. Pert had timely filed joint Federal individual income tax returns for 1986, 1987, 1988, and 1989.

1. <u>Mr. Riffe's Businesses</u>

During 1986, 1987, 1988, and 1989, Mr. Riffe owned businesses known as West Coast Pest Control and West Coast Florida Pressure Cleaning. West Coast Pest Control sprayed pesticides on lawns. West Coast Florida Pressure Cleaning used a pressure cleaning process to wash cars for car dealers. Mr. Riffe owned the car wash business before he married Mrs. Pert. Mrs. Pert worked long hours in both businesses and ran the car wash business. Mr. Riffe was the sole owner of occupational licenses for both of these businesses. He had sole signature authority over the bank accounts for the businesses.

Mr. Riffe's and Mrs. Pert's joint income tax returns for 1986, 1987, 1988, and 1989, include Schedules C for the car wash business in Mr. Riffe's name. They reported on their 1988 return that the business paid Mrs. Pert $13,800 in wages. Their 1989

return also included a Schedule C for Mr. Riffe's lawn spraying business.

### 2. Mr. Riffe's Safe Deposit Boxes

On October 23, 1987, Mr. Riffe leased safe deposit box 276 solely in his name from Barnett Bank of Pinellas County (Barnett Bank). He was the only person listed on the signature card and the only person authorized to open safe deposit box 276. He opened safe deposit box 276 more than 300 times from 1987 to 1991.

On January 14, 1991, Mr. Riffe leased safe deposit box 204 from First Gulf Bank (safe deposit box 204). He was the only person listed on the signature card and the only person authorized to open safe deposit box 204. He opened it three times before he died.

Mr. Riffe also leased a safe deposit box solely in his name from North Carolina National Bank (NCNB).

### 3. Mr. Riffe's Solely Owned Property

On February 27, 1989, Mr. Riffe's grandparents gave him Lot 30, College Hill, Florida. Mr. Riffe was the sole owner of Lot 30, College Hill, until he died. He was the sole owner of Lot 3, Block 95, Town of Sutherland, Florida, from November 20, 1989, until he died.

On January 16, 1991, Mr. Riffe deposited $350,000 at the Barnett Bank. Several days later, he withdrew $325,000 and bought five cashier's checks for $65,000, which he deposited in accounts at Citizens and Southern Bank (C&S), NCNB, Sun Bank of Tampa Bay, Florida Bank of Commerce, and First Gulf Bank.

4.   Mr. Riffe's Death

Mr. Riffe died in a boating accident in a 22-foot Aqua Sport boat near his home on February 11, 1991. He was the sole owner of the boat. When he died, Mr. Riffe and Mrs. Pert lived in a residence at Lot 28, College Hill. The total balance in his six bank accounts (see par. B-3, above) was $115,358 when he died.

C.   Opening the Safe Deposit Boxes

Detective John Barna (Barna), an experienced narcotics investigator with the Pinellas County, Florida, Sheriff's office, began to investigate Mr. Riffe's financial activities shortly after Mr. Riffe died. On February 15, 1991, 4 days after Mr. Riffe died, Barna obtained a search warrant for safe deposit box 204. In it were two sealed bags with $132,000 in cash primarily in denominations of $50s and $100s bundled by paper straps. The Pinellas County Sheriff's office searched only safe deposit box 204.

D.   Mr. Riffe's Estate

    1.   Administration of Mr. Riffe's Estate

Mr. Riffe died testate.  Mrs. Pert was the personal representative and sole beneficiary of Mr. Riffe's estate. Donald F. Kaltenbach (Kaltenbach) represented Mrs. Pert in her capacity as personal representative of Mr. Riffe's estate.  He had previously represented hundreds of personal representatives of estates and was familiar with documents filed in probate proceedings.

Early in the probate proceedings, Mrs. Pert and Kaltenbach knew that respondent was investigating the tax liabilities of Mr. Riffe and Mrs. Pert.  On February 28, 1991, Revenue Agent Joe Elliott (Elliott) questioned Mrs. Pert about her assets, the business operations of West Coast Pest Control and West Coast Florida Pressure Cleaning, how she derived income from the businesses, and her cash on hand.  Mrs. Pert denied that she or Mr. Riffe had a cash hoard or any large sums of cash on hand. Mrs. Pert told Elliott that she had to borrow money from friends and family because she had no funds and she had no signature authority over any of the business bank accounts.  Kaltenbach was present when Elliott interviewed Mrs. Pert on February 28, 1991. On March 1, 1991, Elliott went to Mrs. Pert's residence to get books and records to start an income tax audit.

On March 20, 1991, Kaltenbach and Mrs. Pert deposited $115,358 at Peoples State Bank (acct. No. 105209804) for Mr. Riffe's estate to pay estate bills. The $115,358 came from Mr. Riffe's six bank accounts.

On April 16, 1991, the Pinellas County Sheriff's office gave Mrs. Pert the $132,000 that Barna had seized from safe deposit box 204. Before giving her the money, the Sheriff's office required her to present letters of administration.

2. Inventory of Decedent's Assets

In a Florida probate proceeding a decedent's estate must file an inventory which lists in reasonable detail each asset owned by the decedent and the estimated fair market value of each asset when the decedent died. Fla. Stat. Ann. sec. 733.604(1) (West 1988). Kaltenbach prepared an inventory based on information from Mrs. Pert and a friend of hers whom Kaltenbach knew and trusted. He intended to include only property that was owned solely by Mr. Riffe and not to include jointly owned property. He listed the following property in the inventory:

| Assets | Estimated Fair Market Value |
|---|---|
| **Real Property** | |
| 1. Lot 28, College Hill (homestead) | Not included in valuation |
| 2. Lot 30, College Hill | $15,000 |
| 3. Lot 3, Block 95 | 30,000 |
| | |
| **Personal Property** | |
| 4. Peoples State Acct. # 105209804 | $115,358 |
| | |
| Under C&S Acct. # 836150 | |
| 5. Certificates of Deposit | 100,000 |
| 6. Government Obligation Taxable | 100,000 |
| 7. C&S Tax-Free Income Bond | 45,000 |
| 8. Cash Equivalent Tax-Free Fund | 5,000 |
| 9. C&S Money Market # FV0081203284 | 18,000 |
| | |
| 10. 22' Aqua Sport Boat | 5,000 |
| 11. West Coast Pest Control | 35,000 |
| 12. West Coast Florida Pressure Cleaning | 4,000 |
| 13. 1987 GMC Van ID # 1GTFR24H9HF725519 | 5,000 |
| 14. 1988 GMC Pick-up ID # 2GCFC24H771306969 | 10,000 |
| 15. 1987 GMC ID # 1GTFR24H6F720973 | 4,000 |
| 16. 1987 GMC Astro Van ID # 1G8DM15ZOGB198509 | 5,000 |
| | |
| Total Property - Wherever Located | $496,358 |

The value of the boat was the estimated value after the accident in which Mr. Riffe died.

Mrs. Pert signed the inventory under penalty of perjury on May 13, 1991. Kaltenbach filed it with the probate court. Kaltenbach did not believe that he needed to have appraisals because the total value of the estate was more than $60,000 (the threshold for formal administration) but less than $600,000 (the threshold for filing a Federal estate tax return), and because Mrs. Pert was the sole beneficiary of the estate.

3.  Property Passing Outside of Probate

Mrs. Pert was required to report the value of property passing outside of probate, including jointly owned property, to the Florida Department of Revenue (Preliminary Notice and Report).  On May 13, 1991, Mrs. Pert reported that Lot 28, College Hill, which she valued at about $41,000, passed outside of probate, and that the total value of all property in which Mr. Riffe had an interest was $537,358.

On June 5, 1991, Elliott met with Mrs. Pert's tax attorney to discuss adjustments Elliot had made to Mr. Riffe's and Mrs. Pert's income for 1986, 1987, 1988, and 1989, and to give Mrs. Pert's tax attorney a copy of Elliott's report detailing the adjustments based on unreported income and including the addition to tax for fraud.

Mrs. Pert married Mr. Pert on September 7, 1991, while she was administering Mr. Riffe's estate.  Mr. Pert had known Mr. Riffe for many years.

Mrs. Pert, as representative of Mr. Riffe's estate, signed documents under penalty of perjury on March 23, 1992 (petition to extend time for filing final accounting and petition for discharge), June 19, 1992 (petition to extend time for filing final accounting and petition for discharge), and October 8, 1992 (statement regarding creditors with attachment showing debt owed

to Internal Revenue Service (IRS)), in which she stated that respondent had tax claims against Mr. Riffe's estate.

On October 6, 1992, Mrs. Pert wrote a check to herself for $3,294 to close out the Peoples State Bank account.

Mr. Riffe's estate asked the probate court to close the estate.  To allow the case to close, Kaltenbach prepared the following document, which Mrs. Pert signed on October 8, 1992:

Dated:  October 8, 1992

Re:  Estate of Timothy Christopher Riffe, aka
     Timothy C. Riffe, aka Tim Riffe
     File Number 91-676-E3


The undersigned, KATHLEEN M. PERT, formerly known as KATHLEEN M. RIFFE, as Personal Representative of the above-captioned Estate, will attend to the preparation of Timothy C. Riffe's Final 1040 Individual Return as well as the Final 1041 Estate Income Tax Return.

In addition, KATHLEEN M. PERT, individually and as Personal Representative of the above-captioned Estate, shall be responsible for any and all obligations which may become due to the Internal Revenue Service and shall hold the law firm of Donald F. Kaltenbach, P.A. harmless from any and all liability therefor.

The above-mentioned assurances are being made by the Personal Representative in order to close out the Estate of Timothy Christopher Riffe.


/s/ Kathleen M. Pert

Mrs. Pert signed this document to show the probate court that she would pay any claims by the IRS from the estate that might become due, to allow her to be released from her fiduciary

duties to the estate, and to allow Mr. Riffe's estate to be distributed to her.

On October 8, 1992, Mr. Riffe's estate reported that it had distributed all of its assets to Mrs. Pert according to the plan stated in the petition for discharge. Mr. Riffe's estate used $96,823 of the $115,358 deposited in Peoples State Bank to pay estate expenses, including $57,963 for income tax for Mr. Riffe for tax years 1986 to 1990. The remaining $18,535 was distributed to Mrs. Pert or paid on her behalf while she administered the estate.

Mr. Riffe's estate was closed on October 17, 1992.

E. Mr. Pert's Financial Resources

1. Mr. Pert's Businesses

Mr. Pert started a lawn maintenance business in the late 1980's called Perticular Lawn Service.

After he married Mrs. Pert, Mr. Pert helped her run West Coast Pest Control. Mr. and Mrs. Pert combined their landscaping and lawn spraying businesses to form Perticular Lawn, Inc.

Mrs. Pert transferred the car washing business and a Chevrolet truck with a pressure washing machine to her father. Mr. Pert incorporated Perticular Lawn, Inc. in 1992 and sold it in 1992 or 1993.

2.    Mr. Pert's Finances

Mr. Pert had a drug habit (not further described in the record) in the early 1980's, and he had financial troubles from 1985 to 1989. Ford Motor Credit Co. obtained a judgment against him in 1987 for $3,098 plus costs and interest.

On December 21, 1990, Mr. Pert's father gave Mr. Pert $40,000, which he deposited in C&S. He withdrew the $40,000 on January 7, 1991.

Around July 1991, Mr. Pert's father gave Mr. Pert real property worth $46,000. Mr. Pert sold the property shortly after he received it.

On October 15, 1991, Mr. Pert bought a certificate of deposit in the amount of $30,952.

In 1988, 1989, and 1990, Mr. Pert made less than $11,000 per year. He reported that he had gross income as follows: $8,108 for 1988, $8,589 for 1989, and $10,680 for 1990. Mr. and Mrs. Pert reported that they had taxable income of $34,906 for 1991, $16,098 for 1992, and $42,395 for 1993.

3.    Mr. Pert's Homes

Mr. Pert owned a home at 1332 Hawaii Avenue that he bought in the mid 1980's. Mr. and Mrs. Pert lived there about a year after they were married. Thereafter, they moved to a house that Mrs. Pert built on Lot 30, College Hill. They lived there for about 8 months. They then moved to a motel for about 30 days,

and then to 610 Sandy Hook Road.  Mr. and Mrs. Pert had a young son and they were expecting another child when they stayed at the motel.  Mr. and Mrs. Pert lived modestly.

### 4.  Mr. Pert's Boat

Mr. Pert bought a boat for $11,000 shortly after he married Mrs. Pert in 1991.  He traded in that boat in 1995 for a $24,000 22-foot Hydrasport fishing boat.  He financed the purchase of the second boat and owed $11,000 as of the date of trial.

### F.  The Cash Transactions

On March 20, 1991, Kaltenbach and Mrs. Pert opened the Peoples State Bank account for Mr. Riffe's estate and deposited $115,358, as described above at par. D-3.  On that day, Mrs. Pert wrote a $5,000 check to herself.  On April 9, 1991, she wrote a $5,000 check to herself for a downpayment on a car.

On April 16, 1991, Mrs. Pert deposited $268,000 (items 5-9 on the inventory) in cash in C&S account No. 87051982.  On April 18, 1991, she closed that account, deposited $250,000 in C&S trust account No. 836150 and deposited $18,091 in C&S ultima account No. 81203284.  Mrs. Pert opened the C&S accounts in her name.  On May 6, 1991, Mrs. Pert used part of the $250,000 from account No. 836150 to buy a $100,000 certificate of deposit, and $97,256 to buy a $100,000 U.S. Treasury bill.  On June 5, 1991, Mrs. Pert used part of the $250,000 to pay $45,020 to buy shares of the C&S tax-exempt bond fund.

On June 27, 1991, Mrs. Pert paid $50,000 to the IRS for Mr. Riffe's taxes. On July 2, 1991, respondent applied $28,976 of the $50,000 payment to 1986 and $21,024 to 1989 ($50,000 total).

On November 5, 1991, Mrs. Pert transferred $50,000 from C&S trust account No. 836150 to C&S ultima account No. 81203284.

On November 7, 1991, Mrs. Pert withdrew $199,628 from C&S trust account No. 836150. On November 8, 1991, at the Florida Bank of Commerce, Mrs. Pert used the $100,000 from C&S trust account No. 836150 to buy a $100,000 certificate of deposit (CD 1766), and Mr. Pert bought certificate of deposit No. 2775 for $43,072 (CD 2775). The same employee at Florida Bank of Commerce opened both certificate of deposit accounts for Mr. and Mrs. Pert on November 8, 1991.

On December 11, 1991, Mrs. Pert paid $20,000 to the IRS for Mr. Riffe's taxes. On December 20, 1991, respondent applied $15,000 of the $20,000 payment to 1986 and $5,000 to 1988.

When CD 1766 matured around May 12, 1992, Mrs. Pert used $50,000 of the proceeds to open joint checking account No. 0302052577 at Citizens Bank of Clearwater. She used the other $50,000 to buy joint certificate of deposit No. 0300033611 with Mr. Pert at Citizens Bank of Clearwater.

On June 16, 1992, Mr. Pert withdrew $6,000 in cash from joint checking account No. 0302052577. On June 17, petitioners prematurely redeemed certificate of deposit No. 0300033611 in the

amount of $49,716, and paid a $469 penalty. On June 17, 1992, the bank distributed the $49,716 to petitioners in three cashiers checks as follows: cashier's check No. 18580 for $20,000 to Mr. Pert, cashier's check No. 18581 for $20,000 to Mr. Pert, and cashier's check No. 18582 for $9,716 to Mrs. Pert. On June 18, 1992, Mr. Pert withdrew $5,000 in cash from joint checking account No. 0302052577. Mr. Pert withdrew a total of $11,000 from Citizen's Bank.

On June 18, 1992, Mr. Pert used cashier's check No. 18580 to open account No. 2623699909 with $20,000 at Sun Bank of Tampa Bay in his name. On June 29, 1992, Mr. Pert added Mrs. Pert to the Sun Bank account. On June 30, 1992, he deposited $20,000. Mr. Pert withdrew the following amounts from the Sun Bank account:

| | |
|---|---|
| June 18, 1992 | $5,000 |
| June 26, 1992 | 5,000 |
| June 30, 1992 | 3,000 |
| July 20, 1992 | 3,000 |
| July 22, 1992 | 4,000 |
| July 31, 1992 | 3,000 |
| Feb. 28, 1993 | 7,000 |
| Total | $30,000 |

On June 18, 1992, Mr. Pert used cashier's check No. 18581 to open a joint account at Barnett Bank of Pinellas County. Mr. Pert withdrew the following amounts from Barnett Bank:

| | |
|---|---|
| June 19, 1992 | $5,000 |
| June 26, 1992 | 5,000 |
| June 29, 1992 | 5,000 |
| July 2, 1992 | 5,000 |
| July 20, 1992 | 3,000 |
| July 21, 1992 | 3,000 |

| | |
|---|---|
| July 22, 1992 | 4,000 |
| July 31, 1992 | 3,000 |
| Total | $33,000 |

From June 16, 1992, to February 28, 1993, Mr. Pert withdrew a total of $74,000 from Citizens Bank, Sun Bank, and Barnett Bank.

On November 23, 1992, respondent issued the notice of deficiency to Mr. Riffe's estate, including the determination for the addition to tax for fraud.

During 1991, 1992, 1993, and 1994, petitioners opened more than 20 bank accounts, most of which were closed within 6 months. Some of those accounts were opened only for 2 days.

G.    Petitioners' Purchase of 610 Sandy Hook Road

On March 23, 1992, Mrs. Pert distributed Lot 30, College Hill, to herself as sole beneficiary of Mr. Riffe's estate.  She had a new house built on that property in 1992.  On April 19, 1993, Mrs. Pert sold the house and land for $60,000.  After deducting selling expenses, Mrs. Pert received $56,942 from the sale.  On April 20, 1993, Mrs. Pert bought a cashier's check payable to Secure Title in the amount of $53,018.  She withdrew $3,925 from the original proceeds.

On February 16, 1993, Mr. Pert's parents wired $59,866 to his money market account.

On March 4, 1993, Mr. Pert paid the Ford Motor Credit Co. judgment (see par. E-2, above) in full.

On April 20, 1993, Mrs. Pert transferred $53,018 in cash to Mr. Pert. Mr. Pert used the $53,018 and other funds, including the $59,866 gift from his parents, to buy a house at 610 Sandy Hook Road for $128,000. He took title to the Sandy Hook property in his name. He quitclaimed the Sandy Hook property to himself and Mrs. Pert about a month later.

H. Vehicles

1. 1992 Ford Explorer

In April 1991, Mrs. Pert used $5,000 from Peoples State Bank account No. 105209804 (the account she had used to pay administrative expenses of Mr. Riffe's estate) as a downpayment for a Volkswagen. Mrs. Pert made the monthly payments on the loan to buy the Volkswagen from May to December 1991 from C&S ultima account No. 81203284. She paid the $17,005 balance that she owed for the Volkswagen from C&S ultima account No. 81203284.

On June 15, 1992, Mr. Pert bought a 1992 Ford Explorer for $22,112. He traded Mrs. Pert's Volkswagen, for which he was given credit of $12,778, and paid the remaining $9,335 with a check drawn from Citizens Bank of Clearwater account No. 0302052577. Mr. Pert titled the Ford Explorer in the name of Perticular Lawn, Inc.

2. 1987 GMC Truck

Mr. Pert used a 1987 GMC Truck that had been used by West Coast Pest Control.

I.   Mrs. Pert's Bankruptcy

On December 22, 1993, Mrs. Pert filed a voluntary petition for relief from creditors under chapter 7 of the U.S. Bankruptcy Code, listing respondent as the primary creditor.  In her petition, Mrs. Pert listed as assets a joint interest in Sandy Hook Road worth $130,000, $12 cash on hand, $57 in a joint checking account, household goods and furnishings worth $3,108, and other items including clothes, jewelry, and firearms worth $530.

J.   Closing Agreements and Notices of Transferee Liability

On April 23, 1993, Mrs. Pert signed closing agreements for 1986, 1988, and 1989 for herself and as personal representative of Mr. Riffe's estate.  See Pert v. Commissioner, 105 T.C. 370, 373 (1995).  On June 4, 1993, this Court entered a stipulated settlement agreement in Riffe v. Commissioner, docket No. 15214-91, for 1987.  Id.

On May 27, 1994, respondent issued notices of transferee liability to Mr. and Mrs. Pert determining that each petitioner was liable as a transferee of Mr. Riffe's assets.

OPINION

We must decide whether, and if so to what extent, Mrs. Pert is liable as a transferee of Mr. Riffe's assets, and whether, and if so to what extent, Mr. Pert is liable as a transferee of Mr.

Riffe's assets or as a successor transferee of Mrs. Pert's assets.

A.  Background

   1.  Transferee Liability

The Commissioner may collect unpaid income taxes of a transferor of assets from a transferee or a successor transferee of those assets.  Sec. 6901(a), (c)(2); Commissioner v. Stern, 357 U.S. 39, 42 (1958); Stansbury v. Commissioner, 104 T.C. 486, 489 (1995), affd. 102 F.3d 1088 (10th Cir. 1996).  Petitioners bear the burden of proving that the transferor is not liable for tax and additions to tax.  Sec. 6902(a).  In accordance with our holding in Pert v. Commissioner, supra, Mr. Riffe and Mrs. Pert are liable for the tax and additions to tax in the amounts set forth in the stipulated decision in docket No. 15214-91 and in the closing agreements with respondent.

The Commissioner bears the burden of proving that a taxpayer is liable as a transferee.  Sec. 6902(a); Rule 142(d); Gumm v. Commissioner, 93 T.C. 475, 479-480 (1989), affd. without published opinion 933 F.2d 1014 (9th Cir. 1991).  State law generally determines the extent of a transferee's liability. Commissioner v. Stern, supra at 45; Gumm v. Commissioner, supra at 479.  We apply Florida law in deciding whether petitioners are liable as transferees under section 6901 because all of the

transfers occurred there.  Commissioner v. Stern, supra; Fibel v. Commissioner, 44 T.C. 647, 657 (1965).

2.    Transferee Liability Under Florida Law

Under Florida law, a transferee may be held liable for the debts of a transferor if the transferor conveys assets to the transferee fraudulently or in a manner that is "per se" fraudulent.  Fla. Stat. Ann. secs. 726.105, 726.106 (West 1988); Hagaman v. Commissioner, 100 T.C. 180, 184 (1993) (transferee liability established by applying Florida fraudulent conveyance law); Schad v. Commissioner, 87 T.C. 609, 614 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987).

One way that a creditor may show that a conveyance is fraudulent is by showing that the transferor actually intended to defraud or hinder creditors.  Fla. Stat. Ann. sec. 726.105(1)(a) (West 1988)[2]; Florida Fruit Canners, Inc. v. Walker, 90 F.2d 753,

[2]Fla. Stat. Ann. sec. 726.105 (West 1988) provides:

726.105.  Transfers fraudulent as to present and future creditors.

(1)  A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

    (a)  With actual intent to hinder, delay, or defraud any creditor of the debtor; or

    (b)  Without receiving a reasonably equivalent

(continued...)

757 (5th Cir. 1937).  A creditor may show that a transferor

---

[2](...continued)
value in exchange for the transfer or
obligation, and the debtor:

1.   Was engaged or was about to engage in a
     business or a transaction for which the
     remaining assets of the debtor were
     unreasonably small in relation to the
     business or transaction; or

2.   Intended to incur, or believed or
     reasonably should have believed that he
     would incur, debts beyond his ability to
     pay as they became due.

(2)  In determining actual intent under paragraph
     (1)(a), consideration may be given, among other
     factors, to whether:

(a)  The transfer or obligation was to an insider.
(b)  The debtor retained possession or control of
     the property transferred after the transfer.
(c)  The transfer or obligation was disclosed or
     concealed.
(d)  Before the transfer was made or obligation
     was incurred, the debtor had been sued or
     threatened with suit.
(e)  The transfer was of substantially all the
     debtor's assets.
(f)  The debtor absconded.
(g)  The debtor removed or concealed assets.
(h)  The value of the consideration received by
     the debtor was reasonably equivalent to the
     value of the asset transferred or the amount
     of the obligation incurred.
(I)  The debtor was insolvent or became insolvent
     shortly after the transfer was made or the
     obligation was incurred.
(j)  The transfer occurred shortly before or
     shortly after a substantial debt was
     incurred.
(k)  The debtor transferred the essential assets
     of the business to a lienor who transferred
     the assets to an insider of the debtor.

intended to defraud or hinder creditors under Fla. Stat. Ann. section 726.105 (West 1988), either by direct proof or by using a nonexclusive list of factors (badges of fraud) listed in the statute. Fla. Stat. Ann. sec. 726.105(1) and (2) (West 1988).

A creditor may also establish transferee liability by showing that a conveyance is per se fraudulent. Fla. Stat. Ann. sec. 726.106 (West 1988).[3] There are two ways that a creditor can prove that a conveyance is per se fraudulent. First, a conveyance is per se fraudulent if: (a) The transferor transferred assets to the transferee; (b) the transferor had a preexisting liability at the time of the transfer; (c) the transferee paid inadequate consideration for the transfer; and (d) the transferor was insolvent at the time of or due to the

---

[3] Fla. Stat. Ann. sec. 726.106 (West 1988) provides:

726.106. Transfers fraudulent as to present creditors

(1) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor become insolvent as a result of the transfer or obligation.

(2) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

transfer. Fla. Stat. Ann. sec. 726.106(1) (West 1988). Second, a conveyance is also per se fraudulent if: (a) The creditor's claim arose before the transfer was made; (b) the transfer was made to an insider for an antecedent debt; (c) the debtor was insolvent at that time; and (d) the insider had reasonable cause to believe that the debtor was insolvent. Fla. Stat. Ann. sec. 726.106(2) (West 1988).

B. Whether Mrs. Pert Is Liable as a Transferee of Mr. Riffe's Assets

1. Contentions of the Parties

Respondent contends that Mrs. Pert is liable as a transferee for Mr. Riffe's unpaid tax and additions to tax for 1986, 1987, 1988, and 1989, and contends that the transfer of Mr. Riffe's assets to Mrs. Pert was both actually and per se fraudulent.

As discussed next, we conclude that respondent has established that the conveyances from Mr. Riffe's estate to Mrs. Pert were per se fraudulent under Florida law.

2. Per Se Fraudulent Conveyances Under Florida Law

a. Transfer of Assets of Mr. Riffe's Estate to Mrs. Pert

Petitioners contend that respondent has not shown that the assets which respondent contends were transferred from Mr. Riffe's estate to Mrs. Pert belonged solely to Mr. Riffe. We disagree.

Mrs. Pert signed the inventory which showed that Mr. Riffe's estate included assets with a total estimated fair market value of $469,358. All of that property less an amount for administrative costs was transferred to Mrs. Pert ($469,358 - $96,823 = $372,535).

A personal representative must file an inventory of property of the estate. Fla. Stat. Ann. sec. 733.604(1) (West 1988).[4] The personal representative of an estate is required to list only assets belonging to the deceased in his or her individual capacity that pass through probate; jointly held properties such as assets held by the entireties should not be listed. Florida Bar v. McKenzie, 581 So. 2d. 53, 54 (Fla. 1991); Hill v. Morris, 85 So. 2d 847, 851 (Fla. 1956). Kaltenbach had represented several hundred estates. His normal practice was to identify the property in which the decedent had sole ownership and to estimate the fair market value of the property. He believed that the

---

[4]Fla. Stat. Ann. sec. 733.604(1) (West 1988) provides:

(1) Within 60 days after issuance of letters, a personal representative who is not a curator or a successor to another personal representative who has previously discharged the duty shall file an inventory of property of the estate, listing it with reasonable detail and including for each listed item its estimated fair market value at the date of the decedent's death. Unless otherwise ordered by the court for good cause shown, any such inventory or amended or supplementary inventory is subject to inspection only by the clerk of the court or his representative, the personal representative and his attorney, and other interested persons.

items listed in the inventory, except for the homestead, belonged solely to Mr. Riffe.

Petitioners contend that respondent did not prove that the $268,000 in cash from the safe deposit boxes which was deposited in the C&S bank account did not belong jointly to Mrs. Pert and Mr. Riffe. Petitioners contend that the Pinellas County Sheriff's office returned the $132,000 cash seized from safe deposit box 204 to Mrs. Pert, individually, and not to Mr. Riffe's estate. We disagree. The Sheriff's office required Mrs. Pert to present letters of administration before releasing the cash. The receipt which Mrs. Pert signed states that the authority to release the cash was the probate of Mr. Riffe's estate as shown by letters of administration. We conclude that the seized cash was released to Mrs. Pert in her capacity as personal representative of Mr. Riffe's estate.

Petitioners contend that respondent offered no evidence showing that the other $136,000 included in the $268,000 was solely Mr. Riffe's property or that it was Mr. Riffe's and not Mrs. Pert's property. We disagree. Mrs. Pert did not know about any of the cash in Mr. Riffe's safe deposit boxes. Mrs. Pert told respondent's revenue agent on February 28, 1991, that she did not know that Mr. Riffe had any cash on hand. She also told him that she had no money or sources of funds and that she had to borrow money from friends and family because she had no signature

authority over the business bank accounts. Mr. Riffe was the sole lessee of safe deposit box 204 at First Gulf Bank and safe deposit box 276 at Barnett Bank. He was the only person whose name was on the signature cards, and the only person authorized to have access to those boxes.

The lease or signature card for Mr. Riffe's safe deposit box of NCNB is not in the record. However, Kaltenbach testified that it was solely in the name of Mr. Riffe and that Mrs. Pert could not gain access to it without authority from the probate court. Mrs. Pert did not list the $268,000 as a jointly owned asset passing outside of probate on the Preliminary Notice and Report. We conclude that the cash from all three safe deposit boxes belonged solely to Mr. Riffe.

Petitioners contend that respondent failed to prove that the money did not belong to both Mr. Riffe and Mrs. Pert because she worked hard in the two businesses. We disagree. We are convinced that she worked hard in the businesses, but we think it is implausible that Mrs. Pert's earnings would be part of a cash hoard kept by her husband without her knowledge.

Petitioners point out that Mrs. Pert opened accounts on April 16, 1991, at C&S in her own name and not in the estate's name, and contend that this shows that the cash in the C&S accounts was not solely Mr. Riffe's property. We disagree. Kaltenbach testified that he allowed Mrs. Pert to do that because

she was the only beneficiary and personal representative of the estate and she needed funds. He believed that the claims against the estate, not including those made by respondent, could be paid from the Peoples State Bank account. His testimony and that of the revenue agent show that the funds initially deposited in the accounts at C&S were from Mr. Riffe's estate.

Petitioners suggest that Mrs. Pert owned the contents of the safe deposit boxes (and the other items in the inventory) with Mr. Riffe as tenants by the entireties. We disagree. There is no tenancy by the entireties between spouses if a surviving spouse has no control over a safe deposit box, even if the surviving spouse had access to it. <u>Bechtel v. Estate of Bechtel</u>, 330 So. 2d 217 (Fla. Dist. Ct. App. 1976). Mrs. Pert had neither access to nor control of the safe deposit boxes. Also, Mrs. Pert did not claim that she owned the cash or other property with Mr. Riffe as tenants by the entireties in the Preliminary Notice and Report filed with the Florida Department of Revenue.

b.   <u>Whether Respondent's Claim Arose Before Mr. Riffe's Estate Transferred Assets to Mrs. Pert</u>

To establish liability under Fla. Stat. Ann. section 726.106(1) (West 1988), respondent must prove that respondent's claim arose before Mr. Riffe's estate transferred assets to Mrs. Pert.

Petitioners contend that respondent's claim had not arisen when the transfers were made because respondent had not yet

determined a deficiency in tax or additions to tax, or otherwise assessed tax. Respondent issued the notice of deficiency to Mr. Riffe's estate, including the addition to tax for fraud on November 23, 1992. Petitioners contend that the fraud penalty did not arise before the transfers occurred from March 19, 1991 to October 17, 1992, when the estate closed, because respondent bears the burden of proving fraud and because respondent had not yet determined, much less proven, that fraud applies. We disagree.

Mr. Pert's and Mrs. Riffe's filing of incorrect returns in which they did not report income is the act upon which respondent based the underlying determination. The claim arose when they filed their returns, or at the latest, when the returns for those years were due. We have held that the Commissioner becomes a creditor of a taxpayer for transferee liability purposes at the close of the taxable period in which the tax arose. Hagaman v. Commissioner, 100 T.C. at 185 (included additions to tax for fraud); O'Sullivan v. Commissioner, T.C. Memo. 1994-17. Other courts have held that the Commissioner becomes a creditor of a taxpayer when the return on which the tax should be reported is due to be filed. United States v. Ressler, 433 F. Supp. 459, 463 (S.D. Fla. 1977), affd. 576 F.2d 650 (5th Cir. 1978). The tax years at issue are 1986, 1987, 1988, and 1989. The tax return for 1989 was due on April 15, 1990. Mr. Riffe's estate

transferred all of its assets to Mrs. Pert after April 15, 1990, the latest date that the claim arose.  We conclude that respondent's claim arose before any of the transfers occurred.[5]

We conclude that respondent has proven that the claim arose before Mr. Riffe's estate transferred its assets to Mrs. Pert.

        c.    Consideration for Transfers From Mr. Riffe's
              Estate to Mrs. Pert

To establish liability under Fla. Stat. Ann. section 726.106(1) (West 1988), respondent must show that Mr. Riffe's estate did not receive property of a reasonably equivalent value in exchange for the transfers.

Mrs. Pert did not pay any consideration to Mr. Riffe's estate for the $399,535 in property that Mr. Riffe's estate transferred to her.  Petitioners do not contend that she did.  We conclude that respondent has proven that Mr. Riffe's estate did not receive any consideration for the assets it transferred to Mrs. Pert.

        d.    Insolvency or Substantial Indebtedness of Mr.
              Riffe's Estate

Petitioners contend that the estate was solvent when Mrs. Pert deposited the $132,000 in April 1991.

A debtor is insolvent under Florida law when the value of his or her debts exceeds the value of his or her assets.  Fla.

_____

[5]Petitioners erroneously interpret the Florida statute to require that the claim had been "made" rather than "arose" before the transfer.

Stat. Ann. sec. 726.103(1) (West 1988). Insolvency can be measured at the time of or immediately after the transfer. Fla. Stat. Ann. sec. 726.106(1) (West 1988). Each distribution by an estate is one of a series toward the distribution of the entire estate. O'Sullivan v. Commissioner, T.C. Memo. 1994-17 (heirs to decedent who died owing income taxes received distributions from estate as transferees under the Cal. Civ. Code sec. 3439.05 (West 1993 Supp.), which is identical to Fla. Stat. Ann. section 726.106(1) (West 1988)); Ginsberg v. Commissioner, T.C. Memo. 1965-36. The liabilities of an estate include unpaid Federal taxes, penalties, and interest on the date of the transfer in computing whether an estate is solvent. Leach v. Commissioner, 21 T.C. 70, 75 (1953); LeFay v. Commissioner, T.C. Memo. 1982-420.

When Mr. Riffe's estate transferred its assets to Mrs. Pert, it became insolvent because it had no assets and had a debt to respondent.

### e. Petitioners' Other Contentions

Petitioners contend that respondent must prove that the transferor had fraudulent intent. We disagree. A creditor need not prove that the transferor had fraudulent intent to establish that a conveyance is per se fraudulent under Fla. Stat. Ann. section 726.106(1) (West 1988). Snellgrove v. Fogazzi, 616 So.

2d 527, 529 (Fla. Dist. Ct. App. 1993); In re Smith, 110 Bankr. 597, 599 (M.D. Fla. 1990).

Petitioners contend that the transfer of assets from Mr. Riffe's estate to Mrs. Pert is not a fraudulent conveyance under Florida law because Mr. Riffe and Mrs. Pert were liable for the same debt. Petitioners contend that a transfer of assets between co-debtors does not hinder collection efforts by a creditor. We disagree. Co-debtors should not have the right to decide from which of them their creditors must seek to collect. Petitioners cite no Florida law to support their position. In a case decided under New Mexico law, a spouse who filed a joint return with her husband who later died was held liable as a transferee for the tax liability of her deceased husband. United States v. Floersch, 276 F.2d 714 (10th Cir. 1960). We agree with that result. Also, we note that Mr. Riffe and Mrs. Pert are co-debtors only to the extent of the unpaid balance of their joint tax liabilities of $67,672 plus interest.

Petitioners contend that West Coast Pest Control and West Coast Florida Pressure Cleaning ceased doing business when Mr. Riffe died and that its assets were not distributed by Mr. Riffe's estate. We disagree. Mrs. Pert transferred the car washing business to her father. Mr. and Mrs. Pert tried to continue to operate West Coast Pest Control after they were

married, and later combined their businesses to form Perticular Lawn, Inc.

3.   Conclusion

We conclude that respondent has shown that the transfers of the assets in the inventory were per se fraudulent under Fla. Stat. Ann. section 726.106(1) (West 1988).

4.   Value of the Property Transferred

Respondent contends that Mr. Riffe's estate included $113,600 of property other than cash.  Petitioners contend that respondent has not established the fair market value of the non-cash property listed in the inventory that Mrs. Pert filed with the probate court, and contend that the values given in the inventory are not evidence of fair market value.  We agree with respondent.

Under Florida law, the personal representative of an estate must file an inventory of the property of the estate, including the estimated fair market value of each asset when decedent died. Fla. Stat. Ann. sec. 733.604(1) (West 1988).  Kaltenbach testified that the values used in the inventory were based on the best information available at the time without the expense of appraisals.  We do not believe that the absence of appraisals or the fact that Mr. Riffe's estate was larger than $60,000 and smaller than $600,000 makes the estimate in the inventory unreliable.

Mr. Riffe's estate included $383,358 in cash.

We conclude that respondent has established that the value of assets transferred from Mr. Riffe's estate to Mrs. Pert was $399,535.

5.  Conclusion

We conclude that respondent has established that Mrs. Pert is liable up to $399,535 as a transferee of Mr. Riffe's assets.

C.  Whether Mr. Pert Is Liable as a Transferee of Mrs. Pert's Assets or as a Successor Transferee of Assets From Mr. Riffe's Estate

1.  Contentions of the Parties

Respondent contends that Mr. Pert is liable as a transferee of the assets of Mrs. Pert, and as a successor transferee of the assets of Mr. Riffe's estate, under Fla. Stat. Ann. secs. 726.101(a) (transfer defined) and 726.106 (West 1988) (per se fraudulent conveyance) and Fla. Stat. Ann. sec. 726.105(1)(a) (West 1988) (actual or constructive fraud).  Respondent contends that Mrs. Pert transferred assets which had a total value of $222,206 from Mr. Riffe's estate to Mr. Pert when Mr. Riffe's tax debt, additions to tax, and interest were unpaid and before Mrs. Pert filed a voluntary bankruptcy petition under chapter 7 of the U.S. Bankruptcy Code.

Petitioners contend that respondent failed to prove that Mr. Pert is liable as a transferee or successor transferee. Petitioners contend that Mrs. Pert spent any money she received

from Mr. Riffe's estate, that Mr. Pert's increased financial resources came from gifts from his parents, and that Mr. Pert received no financial benefits from Mrs. Pert.

2.   Background

The principles used to decide if a transferee is liable are also used in deciding if a successor transferee (i.e., transferee of a transferee) is liable. Bos Lines, Inc. v. Commissioner, 354 F.2d 830, 834-835 (8th Cir. 1965), affg. T.C. Memo. 1965-71; Pert v. Commissioner, 105 T.C. at 377. Thus, to show that Mr. Pert is liable as a successor transferee, respondent must establish that Mrs. Pert fraudulently conveyed assets from Mr. Riffe's estate to Mr. Pert under Fla. Stat. Ann. sections 726.105(1)(a) or (b) (West 1988), or that there was per se fraud under Fla. Stat. Ann. sec. 726.106 (1) or (2) (West 1988). As discussed next, we conclude that respondent has established that there were conveyances from Mr. Riffe's estate through Mrs. Pert to Mr. Pert, and that those conveyances were fraudulent under Fla. Stat. Ann. section 726.105(1)(a) and (2) (West 1988).

3.   Mrs. Pert's Transfer of Assets From Mr. Riffe's Estate to Mr. Pert

Respondent contends that Mrs. Pert transferred the following assets from Mr. Riffe's estate to Mr. Pert: (a) $100,000 in cash; (b) a $43,072 certificate of deposit; (c) $53,018, which Mr. Pert used to buy the 610 Sandy Hook Road property; (d) a 1992

Ford Explorer worth $22,112; and (e) the 1987 GMC truck worth $4,000.

### a.   $100,000 in Cash

On April 16, 1991, Mrs. Pert deposited $268,000 that she had received from Mr. Riffe's safe deposit boxes in a C&S account.  Two days later, she closed that account and opened ultima and trust accounts.  She deposited $18,000 in the ultima account and $250,000 in the trust account.  On November 7, 1991, Mrs. Pert withdrew $199,628 in cash from the trust account and bought CD 1766 for $100,000 at the Florida Bank of Commerce the next day.  When CD 1766 matured, Mrs. Pert deposited the $100,000 in two joint accounts with Mr. Pert.  The transfer of funds from an individual account to a joint account is fraudulent if the transfer is a fraudulent conveyance.  Advest, Inc. v. Rader, 743 F. Supp. 851, 854 (S.D. Fla. 1990).  Mrs. Pert conveyed $100,000 to Mr. Pert when she deposited the $100,000 into joint accounts. Thus, Mrs. Pert fraudulently conveyed the entire $100,000 when she deposited it.  Id.

### b.   $43,072 Certificate of Deposit

Respondent contends that Mr. Pert bought a $43,072 certificate of deposit (CD 2775) on November 8, 1991, using funds from Mrs. Pert.  We disagree.

Mr. Pert testified that he used gifts from his parents to buy CD 2775.  Mr. Pert could not have used the $59,836 gift that

he received from his parents in 1993. However, he could have used the $40,000 they gave him in December 1990 or the gift of real estate worth $46,000 that he sold in July 1991.

Respondent contends that we should disregard Mr. Pert's testimony as self-serving and infer that Mrs. Pert gave Mr. Pert the funds to buy CD 2775. Mrs. Pert withdrew $199,628 from the C&S Trust account No. 836150 on November 7, 1991. She bought a $100,000 certificate of deposit on November 8, 1991, and Mr. Pert bought CD 2775 at the same branch of Florida Bank of Commerce from the same person on the same day. Thus, it was possible that Mrs. Pert gave Mr. Pert the funds to buy CD 2775.

The record shows that there were two possible sources of funds for CD 2775. The source of funds alleged by respondent is closer in time and place, a circumstance on which respondent relies. However, Mr. Pert's testimony on this point was plausible and unrebutted. Respondent bears the burden of proof and failed to carry it here.

We conclude that respondent has not proven that Mr. Pert used funds from Mr. Riffe's estate to buy the $43,072 certificate of deposit on November 8, 1991.

c. Cash To Buy the 610 Sandy Hook Road Property

Mrs. Pert gave Mr. Pert $53,018 which he used to buy the 610 Sandy Hook Road property. Respondent contends that 610 Sandy Hook Road was solely Mr. Pert's property. We disagree.

Lot 30, College Hill, belonged to Mr. Riffe when he died. Mrs. Pert received title to it after the probate of Mr. Riffe's estate. Mrs. Pert sold Lot 30, College Hill and received $56,942. The following day, on April 20, 1993, Mrs. Pert used the proceeds from the sale of Lot 30, College Hill, to buy a $53,018 cashier's check payable to Secure Title.

On April 20, 1993, Mr. Pert used the $53,018 as part of the $128,000 that he paid to buy the house at 610 Sandy Hook Road. He initially mistakenly took title in his name, but corrected it within 30 days to be jointly owned by Mr. and Mrs. Pert. Thus, the $53,018 was used to buy Mrs. Pert's half interest in the property.

### d. The 1992 Ford Explorer

Mrs. Pert paid $5,000 from the Peoples State Bank account as a down payment to buy a Volkswagen. She made the monthly payments from the C&S ultima account. Mr. Pert bought a 1992 Ford Explorer for $22,112. He received a $12,777 credit because he traded in Mrs. Pert's Volkswagen. He also used $9,335 in cash from the joint account at Citizens Bank of Clearwater, the funds of which came from Mr. Riffe's estate. The 1992 Ford Explorer was titled in the name of Perticular Lawn, Inc., Mr. Pert's business.

e.    The 1987 GMC Truck

The 1987 GMC truck was transferred from Mr. Riffe's estate to Perticular Lawn.[6]  In the inventory, Mrs. Pert said the estimated fair market value of the 1987 GMC Truck was $4,000.

f.    Conclusion

We conclude that respondent has traced $126,112 of assets ($100,000 cash, $22,112 for the 1992 Ford Explorer, and $4,000 for the 1987 GMC truck) from Mr. Riffe's estate to Mr. Pert.

4.    Statutory Badges of Fraud Under Fla. Stat. Ann. Section 726.105(2) (West 1988)

To establish that a transfer is fraudulent under Fla. Stat. Ann. section 726.105(1)(a) (West 1988), respondent must prove that the transferor intended to defraud or delay creditors. Respondent prevails if respondent shows that several of the following nonexclusive badges of fraud listed in Fla. Stat. Ann. section 726.105(2) (West 1988) are present in this case. Georgetown Manor, Inc. v. Ethan Allen, Inc., 991 F.2d 1533, 1539 (11th Cir. 1993); United States v. Romano, 757 F. Supp. 1331, 1335 (M.D. Fla. 1989), affd. without published opinion 918 F.2d 182 (11th Cir. 1990); Munim v. Azar, 648 So. 2d 145, 152 (Fla. Dist. Ct. App. 1994).  Those badges are:  (a) The transfer was to an insider; (b) the debtor kept possession or control of the property transferred after the transfer; (c) the transfer was

_____

[6]Petitioners concede that the 1987 GMC truck was transferred from Mr. Riffe's estate to Mrs. Pert or Perticular Lawn, Inc.

disclosed or concealed; (d) the debtor had been threatened with a suit before the transfer; (e) the transfer was of substantially all of the debtor's assets; (f) the debtor absconded; (g) the debtor removed or concealed assets; (h) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred; (i) the debtor was or became insolvent shortly after the transfer; (j) the transfer occurred shortly before or after a substantial debt was incurred; and (k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

### a.    Whether There Was a Transfer to an Insider

A spouse of a debtor is an insider.  Fla. Stat. Ann. sec. 726.102(7)(a)(1), (11) (West 1988).  Mr. Pert is an insider for purposes of Fla. Stat. Ann. sec. 726.105 (West 1988).

### b.    Debtor Kept Possession or Control of Property

Mrs. Pert kept possession of the property that became jointly owned and the cash that was deposited in her joint accounts with Mr. Pert.

### c.    Whether the Transferor Concealed the Transfers

There were numerous transfers which made it difficult to trace the funds.  The bank transactions were not concealed, but the extensive use of cash hampered efforts to reconstruct the flow of Mr. Riffe's funds.

Petitioners contend that they moved their money from place to place with no fraudulent intent.  Petitioners contend that, if they had wanted to conceal the transfers, they would have had Mrs. Pert withdraw the cash and give it to Mr. Pert.  We disagree that the existence of another way to conceal transfers means that a party did not try to conceal transfers.

Petitioners point out that respondent did not analyze Mr. Pert's net worth to show that he benefited from the cash withdrawals.  The statute requires respondent to prove that transfers occurred, but it does not require the creditor to perform a net worth analysis of the transferee.  Fla. Stat. Ann. secs. 726.102(12), 726.105(1)(a) and (2) (West 1988).

d.    Anticipated Lawsuit

A transfer in anticipation of a lawsuit is a badge of fraud. See sec. 4, par. 6(d), Comment to Uniform Fraudulent Conveyance Act, p. 655 (West 1985).  Respondent's revenue agent interviewed Mrs. Pert soon after Mr. Riffe died.  Kaltenbach referred Mrs. Pert to a tax attorney.  At a conference on June 5, 1991, the revenue agent gave Mrs. Pert's tax attorney a copy of a detailed report with his recommended adjustments to tax and additions to tax for 1986, 1987, 1988, and 1989.  Mrs. Pert did not agree with the recommendations.  We conclude that Mrs. Pert anticipated that the IRS would determine that she and Mr. Riffe owed taxes when she began transferring assets to Mr. Pert.

e.    Transfer of Substantially All Assets

Mrs. Pert filed a bankruptcy petition in December 1993. Petitioners concede that she had no assets at that time. There is no persuasive evidence in the record that she did anything with the assets other than give them to Mr. Pert. Mr. Pert said that Mrs. Pert spent the funds, but he also said that he did not know what she did with them. We conclude that both Mr. Riffe's estate and Mrs. Pert transferred substantially all of their assets.

f.    Whether the Debtor Absconded

There is no evidence that Mr. Riffe's estate or Mrs. Pert absconded. This badge does not help respondent.

g.    Concealed Assets

There is no record of what Mr. and Mrs. Pert did with the cash they withdrew from banks. This badge does not help respondent.

h.    Consideration

Mr. Pert paid no consideration for the assets he received from Mrs. Pert.

i.    Insolvency

Mr. Riffe's estate was insolvent when it distributed all of its assets to Mrs. Pert. Mrs. Pert was insolvent in December 1993 when she filed her petition in bankruptcy. Elliott testified that Mrs. Pert's tax attorney told him in September

1993 that, if respondent was successful with the proposed assessments of tax and additions to tax, Mrs. Pert would never have to pay them because she would file for bankruptcy protection.  We conclude that the transfers left Mr. Riffe's estate and Mrs. Pert insolvent.

> j.  Whether Mr. Riffe's Estate or Mrs. Pert Transferred Property Shortly Before or After Incurring Substantial Debt

Mrs. Pert incurred a substantial tax debt to respondent when she signed the joint returns at issue here, the last of which was due April 15, 1990.  Elliott interviewed her on February 28, 1991.  She began transferring assets on March 19, 1991, when she wrote a $5,000 check to herself from Peoples State Bank account. We conclude that she knew that she and Mr. Riffe's estate owed tax and that she transferred the property shortly thereafter.

> k.  Transfer to a Lienor

There is no evidence that Mrs. Pert transferred assets to a lienor who transferred them to an insider.  This badge does not help respondent.

> l.  Conclusion

We conclude that respondent has shown that Mrs. Pert had actual intent to hinder, delay, or defraud respondent.

> 5.  Value of the Property Transferred to Mr. Pert

We conclude that Mrs. Pert transferred to Mr. Pert $100,000 in cash, a 1992 Ford Explorer and the 1987 GMC truck.  The total

value of the property that Mrs. Pert transferred to Mr. Pert is $126,112.

D.   Whether Mr. Pert is Liable as a Transferee of Mrs. Pert's Assets

Respondent contends that Mr. Pert is liable as a transferee of Mrs. Pert's assets for her income tax deficiencies for 1986, 1987, 1988, and 1989, totaling $67,672 plus interest.

Petitioners contend that respondent failed to show that Mr. Pert is liable as a transferee of the assets of Mrs. Pert for the same reasons discussed above at par. C.  In addition to the arguments in par. C, above, petitioners contend that respondent failed to show that collection efforts against Mrs. Pert would be fruitless.  We disagree.  Fla. Stat. Ann. section 726.105 (West 1988) does not require the creditor to prove that collection efforts would be fruitless.  In any event, we conclude that collection efforts against Mrs. Pert would have been fruitless because she had no assets and filed for protection in bankruptcy.

We conclude that Mr. Pert is liable as a transferee of Mrs. Pert's assets for her income tax deficiencies for 1986, 1987, 1988, and 1989, and that she transferred assets to Mr. Pert worth $126,112.  Mrs. Pert's income tax liability for those years is $67,672 plus interest.

E.   Whether Respondent Properly Credited Mrs. Pert's Payments

Petitioners contend that the amounts of unpaid tax stated in the notices of transferee liability are incorrect because

respondent did not properly credit Mrs. Pert's payments of $50,000 that she made on June 27, 1991, and $20,000 that she made on December 11, 1991. We disagree. On July 2, 1991, respondent credited Mrs. Pert's $50,000 payment by applying $28,976 to 1986 and $21,024 to 1989 ($50,000 total). On December 20, 1991, respondent credited Mrs. Pert's $20,000 payment by applying $15,000 to 1986 and $5,000 to 1988.

F.   Mrs. Pert's Motion To Enter Decision Based on U.S. Bankruptcy Court Order

Mrs. Pert filed a motion to enter decision in her favor based on the order of the U.S. Bankruptcy Court for the Middle District of Florida, Tampa Division, that transferee liability is not a tax, but is a general unsecured claim that is not excepted from discharge under 11 U.S.C. sections 507 or 523 (1994) of the Bankruptcy Code. In re Pert, No. 93-13179-8B7 (M.D. Fla. Sept. 27, 1996) (order granting debtor's motion for summary judgment). The U.S. Bankruptcy Court concluded that Mrs. Pert's previous discharge applied to her transferee liability. Respondent objected to Mrs. Pert's motion.

Our conclusion here does not conflict with the U.S. Bankruptcy Court's Order. We are not deciding whether Mrs. Pert was discharged of transferee liability under the bankruptcy laws; we are deciding whether Mrs. Pert is liable as a transferee and whether Mr. Pert is liable as a successor transferee under the Internal Revenue Code. Neither party has informed us that there

is a stay in effect.  Our opinion here does not interfere with the exercise of the jurisdiction of the bankruptcy court.

We need not and should not act to implement the bankruptcy court's order.  We have no jurisdiction to decide whether Mrs. Pert's liability as a taxpayer or transferee has been discharged in bankruptcy.  See <u>Neilson v. Commissioner</u>, 94 T.C. 1, 8-9 (1990).

To reflect concessions and the foregoing,

<u>An appropriate Order will be issued and decisions will be entered under Rule 155</u>.