MARK G. SCHAD, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 26148-84, 28216-84.     Filed September 17, 1986.

*Thomas G. Christmann* and *Walter M. Tovkach*, for the petitioner.
*Francis C. Mucciolo*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined in docket No. 28216-84 that petitioner is liable to the extent of $300,000 as transferee of Joseph F. Collins, deceased. Respondent also determined in docket No. 26148-84 a deficiency in the amount of $93,779 in petitioner's 1983 income tax together with additions to tax in the amount of $9,193 under section 6651(a)(1),[1] $4,689 under section 6653(a)(1), $5,521 under section 6654, and 50 percent of the interest due on $93,779 under section 6653(a)(2). The issues presented for decision are as follows:

(1) Whether petitioner is liable as a transferee of the assets of Joseph F. Collins, deceased;

(2) Whether $174,679 seized from petitioner by agents of the Florida Department of Law Enforcement in November 1983 during his attempt to purchase 600 pounds of marijuana and $14,200 used by him to purchase certain real estate are taxable to him as income for 1983; and

(3) Whether petitioner is liable for additions to tax under sections 6651(a)(1), 6653(a)(1), 6653(a)(2), and 6654 for 1983.

### FINDINGS OF FACT

Petitioner was a legal resident of Ocala, Florida, when he filed the petitions in these cases. He filed his income tax return for 1983 with the Internal Revenue Service Center, Atlanta, Georgia, on January 25, 1985.

### 1. *Transferee Liability Issue*

Petitioner met Joseph F. Collins (Collins) in the Florida Keys in the fall of 1973 when petitioner was 19 and Collins was 21 years of age. During 1977, petitioner worked for

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

Collins in a boat repair business, and they were close personal friends.

In January 1977, Collins was convicted in the U.S. District Court for the Southern District of Mississippi on charges of conspiring to import, distribute, and possess marijuana. In December 1977, petitioner received $300,000 from Collins; Collins told petitioner at that time that if anything happened to him (Collins), the money would become petitioner's. Collins was afraid to keep the money at his own house; he was fearful that certain individuals who had attempted to kill him a short time previously would try again if he kept the money.

On May 4, 1978, Collins died from gunshot wounds received in a gun battle in Key West, Florida, in which Collins was armed with a Thompson machine gun. During the month of May 1978, intestacy proceedings were instituted for the probate of Collins' estate in Monroe County, Florida. The value of his estate, without taking into consideration the $300,000 transferred to petitioner and any tax liabilities of the estate, was $7,842.21 as of August 26, 1978. The personal representatives of Collins' estate paid creditors $191.50 on claims against the estate and attorney fees of $658 in October 1978 and distributed the remainder to his parents. Petitioner did not turn over to the personal representatives of Collins' estate or to Collins' parents any of the money he received from Collins in December 1977.

In 1984, respondent determined that Collins received income of $300,000 for 1977 which he failed to report and, as a result, owed an income tax deficiency and additions to tax and interest as of May 17, 1984, in the total amount of $421,801.42. There is no evidence in the record challenging the correctness of this determination.

Taking into account Collins' liability for 1977 income tax deficiencies, additions to tax, and interest, Collins' transfer of the $300,000 to petitioner was made when Collins was insolvent or it rendered Collins and his estate insolvent. For respondent to have attempted to collect those liabilities from Collins' estate would have been a useless gesture. Respondent determined that petitioner is liable as transferee to the extent of $300,000 of Collins' unpaid taxes, additions to tax, and interest for 1977.

## 2. *Income Tax Deficiency Issue*

The income tax returns filed by petitioner for 1981, 1982, and 1983 state that he was a self-employed carpenter. The Schedules C attached to those returns show that his gross receipts ranged from $13,917 to $17,125 and that his net profit was approximately $14,000 per year. The schedules show no expenditures for cost of goods sold in any year except expenditures of $4,147.70 for such purpose for 1983.

In 1979, petitioner paid cash of $62,500 for some real property in Broward County, Florida. In 1980, he paid approximately $10,000 toward the purchase of a mobile home located in Ocala. In 1981, he paid cash of $6,000 for a 1980 Pontiac automobile. In the summer of 1983, he bought a 1982 pickup truck for cash of $10,000. In 1983, he also loaned $2,500 to one of his sisters and $1,400 to another sister.

In June 1978, petitioner attempted to transport 30 pounds of marijuana from Miami to Minnesota and was arrested at the Miami Airport. In 1981, he was stopped for speeding and the officer found some marijuana in his vehicle and arrested him on a misdemeanor charge. Petitioner was not convicted of a crime as a result of these arrests.

On November 4, 1983, petitioner received a telephone call from Robert A. Anslow (Anslow), whom he had known for 3 or 4 years, inviting him to come to Tallahassee and bring with him as much cash as he had available for investment in a business venture. Petitioner took $174,679 to Tallahassee. Anslow told petitioner that he wanted petitioner to buy 600 pounds of marijuana which had been offered for sale at a price of $320 to $330 per pound. Other individuals who had met Anslow and petitioner in Tallahassee were to assist in marketing the purchase.

Petitioner examined a sample of the marijuana and concluded that the price was too high and the quality was not satisfactory. Petitioner later went to inspect the remainder of the marijuana and was arrested by the purported sellers, who turned out to be agents of the Florida Department of Law Enforcement.

Petitioner's attempted purchase of the 600 pounds of marijuana was part of a larger transaction involving several hundred more pounds of marijuana. Seven other individuals,

in addition to petitioner, were arrested in connection with the activity and six of them, including Anslow, pleaded guilty to violating portions of title 21 of the United States Code. Petitioner and petitioner's brother were indicted on a charge of conspiring to possess with intent to distribute marijuana in violation of sections 841 and 846 of title 21 of the United States Code. Petitioner was found not guilty by a jury and a directed judgment of acquittal was entered in the case of petitioner's brother.

In the course of the arrest of petitioner and others on or about November 5, 1983, Florida Department of Law Enforcement agents and other local law enforcement agents seized property that was in the possession of the individuals who were arrested. They seized approximately $174,000 in currency from petitioner. Forfeiture proceedings were instituted in the State court and none of the currency was returned to petitioner.

In the notice of deficiency issued to petitioner for 1983, respondent used the expenditures method of income reconstruction and determined that petitioner had taxable income of $200,879, consisting of the following:

| | |
|---|---|
| Real estate purchase in Marion County.......... | $14,200 |
| Cash seized by State law enforcement officers ... | 174,679 |
| Personal living expenses at $1,000 per month.... | 12,000 |
| Total known expenditures...................... | 200,879 |

On this basis, respondent determined the deficiency and additions to tax here in dispute.

## OPINION

### 1. *Transferee Liability*

Section 6901(a)(1)(A) authorizes the assessment of transferee liability, at law or in equity, in the same manner as the liability for income taxes. This provision, however, does not create any separate liability; it merely provides a secondary method for enforcing the existing liability of a transferor. *Mysse v. Commissioner*, 57 T.C. 680, 700-701 (1972); *C.B.C. Super Markets, Inc. v. Commissioner*, 54 T.C. 882, 897-898 (1970). The substantive question of whether a transferee is liable for his transferor's obligation and the extent of his liability depends upon State law. See, e.g.,

*Commissioner v. Stern*, 357 U.S. 39, 45 (1958); *United States v. Fernon*, 640 F.2d 609, 611 (5th Cir. 1981).

To support his determination that petitioner is liable as transferee for the taxes owed by Collins, respondent relies upon Florida Statutes Annotated section 726.01 (West 1969) which provides, in pertinent part, that every gift or transfer of goods made with the purpose or intent to delay, hinder, or defraud creditors shall be void and of no effect. To constitute a fraudulent conveyance under this section "there must be a creditor to be defrauded, a debtor intending fraud, and a conveyance of property which is applicable by law to the payment of the debt due." *Bay View Estates Corp. v. Southerland*, 114 Fla. 635, 154 So. 894, 900 (1934). Obviously, the Government was a creditor of Collins for the taxes he owed and, because he transferred the $300,000 to petitioner without consideration, that sum was subject to application on his tax debt. The intention to defraud in this context consists of an intentional act of withdrawing property from the reach of creditors. *Bay View Estates Corp. v. Southerland*, 154 So. at 900. A conveyance without consideration by one who is indebted and insolvent is presumptively fraudulent, regardless of the actual intent of the transferor, when attacked by an existing creditor. *United States v. Ressler*, 433 F. Supp. 459, 464 (S.D. Fla. 1977); *Ostend Realty Co. v. Biscayne Realty & Ins. Co.*, 99 Fla. 1221, 128 So. 643, 645 (1930).

Apart from the presumption arising from a gratuitous transfer by an insolvent debtor, the requisite intention to defraud can be found or inferred from indicia of fraud such as:

(1) lack of consideration for the transfer, *Gyorok v. Davis*, 183 So. 2d 701, 703 (Fla. App. 1966); (2) close family relationship between the transferor and the transferee, *Fisher v. Grady*, 131 Fla. 1, 14, 178 So. 852, 858 (1937); (3) pending or threatened litigation against the transferor, *Money v. Powell*, 139 So. 2d 702, 704 (Fla. App. 1962); and (4) insolvency or substantial indebtedness of the transferor, *Banner Construction Corp. v. Arnold*, 128 So. 2d 893, 896 (Fla. App. 1961). * * * [*United States v. Fernon*, 640 F.2d at 613.]

At Collins' death in May 1978, he owed the Government income taxes, additions to tax, and interest for 1977 in an amount in excess of $400,000. Even though those liabilities

were unassessed at the time, they must be taken into account as a debt in determining Collins' solvency and petitioner's liability as Collins' transferee. *Kreps v. Commissioner*, 351 F.2d 1, 10 (2d Cir. 1965), affg. 42 T.C. 660 (1964); *Scott v. Commissioner*, 117 F.2d 36, 38 (8th Cir. 1941), affg. a Memorandum Opinion of this Court. Because Collins had assets of only $7,842.21 at his death, the $300,000 gratuitous transfer to petitioner rendered Collins and, later, his estate insolvent. See *Banner Construction Corp. v. Arnold*, 128 So. 2d 893, 896 (Fla. App. 1961). Although petitioner was not a blood relative of Collins, he was employed by Collins during 1977 and was a close associate and trusted friend. See *Money v. Powell*, 139 So. 2d 702, 704 (Fla. App. 1962). As a result of Collins' transfer of the money to petitioner, the money was placed beyond the reach of Collins' creditors except through transferee proceedings. We hold that the transfer was a fraudulent transfer under Florida law and that petitioner is liable as Collins' transferee of these funds.

Petitioner contends that he is not a transferee of the $300,000 because Collins did not "transfer" it to him. He argues that Collins did not make a gift to him in December 1977 because "a condition was placed on the arrangement, i.e., Collins had to die before the money became Petitioner's." Further, he argues, petitioner did not inherit the money under Florida law because Fla. Stat. Ann. section 732.502 (West 1976) expressly provides that every will must be in writing and signed and witnessed in a prescribed manner. Any will that does not comply with the statute is not effective. *In re Neil's Estate*, 39 So. 2d 801 (Fla. 1949). Accordingly, the argument goes, it is irrelevant under Florida law that petitioner mistakenly believed the money to be his and treated it as if it were his own after Collins' death.

Petitioner's argument misconceives the legal effect of the delivery of the money to him. As we understand Florida law, Collins' transfer to petitioner was a gift causa mortis. Such a gift has some of the characteristics of a gift inter vivos and some of a testamentary disposition and falls between those two concepts.

In *Leonard v. Campbell*, 138 Fla. 405, 189 So. 839, 840 (1939), the court explained that to constitute a gift causa mortis—

there must be an intention to give, a delivery so that the donor loses dominion over the gift and donee retains possession until donor's death, and a contemplation of death from present illness or impending danger. * * * It is revocable at the will of the donor; by his survival of the danger; by his outliving the donee; or by deficiency of assets to pay debts of a deceased donor. In this feature of defeasibility it is distinguishable from a gift inter vivos. * * *

A similar definition appears in *Szabo v. Speckman*, 73 Fla. 374, 74 So. 411, 413 (1917).[2] See also *Wright v. Brown*, 146 Fla. 572, 1 So. 2d 871 (1941); *Heyser v. Crane*, 144 Fla. 663, 198 So. 472 (1940). We have found no Florida cases dealing directly with the issue, but the general rule is that a gift causa mortis is not invalid because it is not in writing and executed in the form essential to a will. *In re Nols' Estate*, 251 Wis. 90, 28 N.W.2d 360, 363 (1947); *Cannon v. Williams*, 194 Ga. 808, 22 S.E.2d 838, 845-846 (1942); *Johnson v. Colley*, 101 Va. 414, 44 S.E. 721, 722-723 (1903). 1 W. Page, Wills, sec. 6.1, at 220 (1960); T. Atkinson, Handbook of the Law of Wills 205-206 (1953).

In the instant case, the facts show a gift causa mortis. Shortly before Collins turned the $300,000 over to petitioner in December 1977, certain individuals had tried to kill Collins and he expected them to try again. He believed he faced a very real impending danger. Collins delivered the $300,000 to petitioner and told him that if anything happened to Collins, the money belonged to petitioner. The implication is that petitioner was to return the money to Collins if he requested it or if he survived the danger he then faced. A short time later Collins was killed, and petitioner kept the money and treated it as his own. When asked whose money it was at Collins' death, petitioner responded: "In my mind, it was mine." Because Collins was insolvent at the time of, or was rendered insolvent by, the

---

[2]In *Szabo v. Speckman*, 73 Fla. 374, 74 So. 411, 413 (1917), the court said:

"A gift of this character must be made in contemplation of the near approach of death from danger then impending, to take effect absolutely only upon the death of the donor. There must be delivery to the donee, actual or constructive, of the thing given, or the means of getting possession and enjoyment of it. 'It is the fact of delivery that converts the unexecuted purpose into an executed and complete gift.' "

transfer of the funds, petitioner is liable to the Government as transferee.

Petitioner argues that he cannot, in any event, be held liable as transferee of the full $300,000 because $174,679 of it was forfeited to the State of Florida when he was arrested in November 1983. As we shall discuss, we are not convinced that the forfeited money was part of the money received from Collins. Even if it was, however, petitioner kept the money, admittedly used much of it, and regarded it as his own. He used the $174,679 in such manner as to subject it to forfeiture. Had he lost the money by gambling or making a bad investment, for example, he could not now be heard to deny liability on the ground he does not have the dollars he received from Collins. Similarly, his use of the $174,679 in such manner as to expose it to forfeiture to the State does not provide a defense to transferee liability to Collins' creditor, the Federal Government.

## 2. *The Deficiency Issue*

The deficiency for 1983 was determined by use of the cash expenditures method of income reconstruction and was based on three income items, cash in the amount of $14,200 used to purchase real estate in Marion County, cash in the amount of $174,679 seized by State law enforcement officials, and estimated personal living expenses in the amount of $12,000. Petitioner contends, and respondent denies, that the cash involved in the first two items was part of the $300,000 Collins placed in petitioner's custody in December 1977. As to the living expenses, petitioner's 1983 income tax return, filed January 25, 1983, shows adjusted gross income of approximately $12,500; petitioner offered no evidence to show that the $12,000 estimate was erroneous, and we, therefore, treat that item as resolved.

Petitioner contends that, when Collins gave him the $300,000 in a suitcase, he placed the suitcase in the crawl space under his house in North Miami and kept it there. When he moved to Ocala, he maintains that he put a floor safe under the doghouse in his yard and kept the money there. When he paid $14,200 for real estate in Marion County in 1983, he testified that he used the Collins money to make the payment. When Anslow called him and invited

him to bring all the money he had to invest in a "business venture," he contends that he took the $174,679 of Collins' money to Tallahassee where it was seized by and forfeited to the State law enforcement officials. Under this version of the facts, petitioner argues that he had no unreported income for 1983 and the determined deficiency was erroneous.

The crucial factual issue to be resolved is whether the money used to buy the Marion County land and the money forfeited to the State came from a 1983 income generating activity or from the nontaxable Collins gift. Citing *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977), petitioner argues that respondent has the burden of proving that the forfeited $174,679 was income generated in 1983 from drug dealing and that respondent has not carried that burden.

In the usual case, petitioner would have the burden of proof as to both items of income. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. In *Weimerskirch v. Commissioner*, *supra*, the Commissioner determined that the taxpayer had a deficiency in his income tax based on a revenue agent's finding that the taxpayer omitted income derived from heroin sales. The only evidence supporting this determination were statements made to the agent by two confidential informants and certain information obtained by him from law enforcement officials. No admissible evidence was introduced at the trial to substantiate those statements or information or otherwise linking the taxpayer to drug dealing. The Court of Appeals held that a "deficiency determination which is not supported by the proper foundation of substantive evidence is clearly arbitrary and erroneous" and that the Government had the burden of producing some evidence linking the taxpayer to an income-producing activity. 596 F.2d at 362. See also *United States v. Janis*, 428 U.S. 433 (1976); *Llorente v. Commissioner*, 649 F.2d 152 (2d Cir. 1981), affg. in part and revg. and remanding in part on this issue 74 T.C. 260 (1980); *Jackson v. Commissioner*, 73 T.C. 394 (1979).

The crucial distinction between the *Weimerskirch* line of cases, on the one hand, and the instant one, on the other, is

that petitioner had in his possession on November 4, 1983, cash in the amount of $174,679 which he brought to Tallahassee and attempted to use in the purchase of marijuana. Petitioner's only explanation of his possession of this large sum of money was his assertion that it was Collins' money taken from his doghouse safe, and the credibility of that explanation is at issue. In the *Weimerskirch* line of cases, the taxpayers were not shown by admissible evidence to have actually possessed any of the funds that the Commissioner determined to be taxable income.

The distinction was explained by the Court of Appeals that decided *Weimerskirch* in a subsequent case, *Delaney v. Commissioner*, 743 F.2d 670 (9th Cir. 1984), affg. a Memorandum Opinion of this Court, where the Commissioner determined that $43,000 in Swiss gold coins and $305 in unexplained bank deposits were unreported income. The court stated (*Delaney v. Commissioner, supra* at 671-672):

The Delaneys concede as true the IRS's evidence that the Delaneys brought into the country over $40,000 in gold coins over a two-year period. In the course of an IRS audit of their tax returns, the Delaneys gave what the IRS deemed incomplete or unsatisfactory answers to inquiries concerning the acquisition of the gold. The presumption of correctness applies in these circumstances. *Calhoun v. United States*, 591 F.2d 1243, 1245 (9th Cir. 1978), cert. denied, 439 U.S. 1118, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *Ruark v. Commissioner*, 449 F.2d 311, 312 (9th Cir. 1971) (per curiam).

The Government correctly distinguishes *Weimerskirch v. Commissioner*, 596 F.2d 358 (9th Cir. 1979), as a case in which the Commissioner failed to connect the taxpayer to the alleged assets that were the basis of the deficiency. By contrast, the Delaneys are the admitted owners of the asset that is the basis of the deficiency. *Weimerskirch* is thus inapplicable.

See also, e.g., *Boyett v. Commissioner*, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court; *Estate of Mason v. Commissioner*, 64 T.C. 651, 656 (1975), affd. 566 F.2d 2 (6th Cir. 1977), and the long list of cases there cited; cf. *Tokarski v. Commissioner*, 87 T.C. 74 (1986). We do not think the *Weimerskirch* line of cases was intended to exempt narcotics dealers from these long-established legal principles and create a safe haven for them, permitting them to be taxed on money in their

possession only if they are caught in the act of buying or selling narcotics for a profit. We think connecting petitioner to the funds that form the basis of the deficiency is sufficient to give him the burden of proving the deficiency determination erroneous.

We must then decide the credibility of petitioner's explanation that the $174,679 was part of the money Collins gave him in 1977, 6 years previously. Positive and uncontradicted testimony of a particular fact will ordinarily be accepted, but testimony which is inherently questionable, improbable, or unreasonable may be rejected even though no contradictory testimony is offered. *Boyett v. Commissioner*, 204 F.2d 205, 208 (5th Cir. 1953), affg. a Memorandum Opinion of this Court.

Petitioner testified, as we have stated, that he kept the Collins money he received in 1977 in the crawl space under his home in North Miami and later in Ocala in a floor safe under his doghouse. He testified in his deposition in the proceedings for the forfeiture of these funds that Robert and Becky Clift, Danny and Darryl Cunningham, petitioner's father-in-law, Lloyd Athey, and petitioner's wife knew about his Collins money, but he called none of those individuals to corroborate in any way the fact or the amount of the Collins money remaining in 1983. *Wichita Terminal Elevator Co. v. Commissioner*, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). He rested his entire case on his own self-serving uncorroborated assertions.

Petitioner introduced in evidence no records of any kind and no other accounting for the use of the $300,000 over the 6-year period that he contends he held it.[3] On direct

---

[3]In *Webb v. Commissioner*, 394 F.2d 366, 373 (5th Cir. 1968), affg. a Memorandum Opinion of this Court, the court said:

"the absence of adequate tax records does not give the Commissioner carte blanche for imposing Draconian absolutes. * * * [However,] such absence does weaken any critique of the Commissioner's methodology. * * *

"Arithmetic precision was originally and exclusively in [the taxpayer's] hands, and he had a statutory duty to provide it. * * * Having defaulted in his duty, he cannot frustrate the Commissioner's reasonable attempts by compelling investigation and recomputation under every means of income determination. Nor should he be overly chagrined at the Tax Court's reluctance to credit every word of his negative wails. * * *"

See also *Adamson v. Commissioner*, 745 F.2d 541, 548 (9th Cir. 1984), affg. a Memorandum Opinion of this Court; *Keogh v. Commissioner*, 713 F.2d 496, 502 (9th Cir. 1983), affg. a

examination, he limited his testimony to a conclusory statement that the $174,679 was the same money he received from Collins. On cross-examination, he admitted that he had used at least $100,000 of the Collins money to buy real estate and automobiles and to make loans to his sisters. But he limited his admissions almost exclusively to transactions respondent was able to document. He also testified that he used some of the Collins money to buy building materials for his carpentry business but did not know how much.

According to petitioner's testimony on cross-examination, in both 1979 and 1980, before he was licensed for home construction, he built between 6 and 10 additions to houses and on each addition spent $1,000 to $1,500 for materials. Beginning in 1980, after he was licensed, he constructed house additions at the rate of "a dozen or so" a year and in the fall of 1983 he started the construction of a house. In fact, he testified that he had placed $9,000 to $10,000 of the money seized by the Florida police in a separate briefcase for his use in the purchase of building materials. According to his testimony, all or a part of the costs of these materials was paid from Collins' money which he replaced in whole or in part when he was paid for his services. Yet as noted above, his 1981 and 1982 income tax returns show no expenditures for cost of materials and his 1983 return shows an expenditure of only $4,147.70 for materials in that year. This inconsistency is not explained.

Petitioner's explanation for not banking the Collins' money was fear that the people who killed Collins would try to kill him. But he would have us believe that he used Collins' currency in carrying out all of these substantial business transactions apparently without trepidation. The use of currency in such large quantities for the purchase of real estate and building materials, if we are to believe his testimony in this respect, would inevitably raise questions and attract attention. Moreover, there is no explanation of why he did not bank his construction business receipts rather than return them to his doghouse safe. This whole line of testimony raises serious doubts as to credibility. We

---

Memorandum Opinion of this Court; *United States v. Stonehill*, 702 F.2d 1288, 1296 (9th Cir. 1983).

are not convinced that the reported construction business was not a front for other activities.

In a deposition taken on May 16, 1984, in the State court proceedings for the forfeiture of the $174,679, petitioner was questioned in great detail on how he acquired the money and what he did with it after Collins gave it to him. At one point in the deposition, on being asked whether the cash he had when he was arrested "was the exact same * * * bills you had received" from Collins, he replied that "some of it was and some of it wasn't." He testified that he had earned some of the money and added it to the Collins cache and that he could not "honestly tell you" how much of it was Collins money. Yet, at the trial of the instant case he testified that "it was all Joe's money." Again, these inconsistencies raise serious doubts as to petitioner's credibility.

Further, his whole account of the circumstances in which he took the $174,679 to Tallahassee in response to a telephone call from Anslow in November 1983 is incredible for one who had carefully safeguarded a large sum of money for 6 years. For all of those years since Collins' death, petitioner testified he had been afraid to deposit the Collins money in a bank lest the men who killed Collins would kill him. According to his testimony, he did not know what Anslow did for a living and saw him only 2 or 3 times a year during the 3 or 4 years that he had known him.. Yet, according to his testimony, when Anslow called him and asked him to put together whatever funds he could and come to Tallahassee for a business venture, he took the $174,679 out of his doghouse safe and responded to this casual friend's invitation without asking for any explanation of the proposed transaction.

Petitioner did not learn that he was to buy marijuana, the story goes, until he met Anslow in Tallahassee. Although petitioner denied he had ever before bought a controlled substance, he did not flinch when he learned what Anslow proposed. Rather, he engineered all further activity and took full responsibility for determining the quality and the reasonableness of the price of the marijuana that was for sale. If his denials of any previous involvement in marijuana purchases and sales are true, we think it incredible that he,

a neophyte in the narcotics world, would have taken over from Anslow and his other confederates the engineering of the negotiations for the purchase of 600 pounds of marijuana at a cost of some $175,000.

Viewing the record as a whole, we are not convinced that the $174,679 was not money petitioner had made in 1983 from narcotics dealings. Petitioner has a long history of marijuana activity. Collins, a long-time friend, who gave petitioner the $300,000 in December 1977, had been convicted on a marijuana charge earlier that year. In 1978, petitioner was arrested for attempting to transport 30 pounds of marijuana from Miami to Minnesota. In 1981, he was caught with marijuana in his truck. Then, in November 1983, he took the $174,679 to Tallahassee and actively participated in the abortive attempt to purchase 600 pounds of marijuana. True, he was not convicted as a result of any of those activities but he admitted that they occurred. Given this background, the absence of any corroborating records or testimony, and the evasiveness and inconsistencies in his accounts of the source of the $174,679, we find that petitioner has not carried his burden of proof.

We are aware that the results of this conclusion would be Draconian, indeed, if the $174,679 was part of the Collins money. Petitioner would be subjected to transferee liability, taxation, and forfeiture[4] for the same amount. We have been very conscious of this consideration in weighing the evidence. As we view the credible evidence, however, it will simply not support a finding that the $174,679 forfeited to the State or the $14,200 used to buy the Marion County real estate was part of the Collins money or that it was not income earned in 1983.

### 3. Additions to Tax Issue

Apart from his contentions that he is not liable as transferee and that the $174,679 was not taxable income, petitioner offered no evidence to show that he is not liable for the determined additions to tax. Consistent with our

---

[4]The law is settled that a deduction is not allowable for property forfeited in connection with illegal marijuana and other narcotics dealing activity. E.g., *Holmes Enterprises, Inc. v. Commissioner*, 69 T.C. 114, 116-117 (1977); *Holt v. Commissioner*, 69 T.C. 75, 79 (1977), affd. per curiam 611 F.2d 1160 (5th Cir. 1980).

holdings on the transferee and deficiency issues, respondent's determinations as to the additions to tax are sustained.

To reflect the foregoing,

*Decisions will be entered for the respondent.*