T.C. Memo. 2001-4

UNITED STATES TAX COURT

JOSEPH ALAN PIOLE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 19094-96.                    Filed January 9, 2001.

Joseph Alan Piole, pro se.

<u>John M. Zoscak, Jr.</u> and <u>Donna P. Leone</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

WELLS, <u>Chief Judge</u>:  Respondent determined deficiencies in
and an addition to tax for fraud and fraud penalties in respect
of petitioner's tax liabilities for 1988, 1989, 1990, and 1991.
Because petitioner failed to maintain adequate tax records during
the years in issue, respondent relied upon the net worth (plus
expenditures) method to reconstruct petitioner's taxable income.

Unless otherwise indicated, section references are to sections of the Internal Revenue Code, as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

After conceding certain items, respondent determined that petitioner is liable for deficiencies in income tax, an addition to tax, and penalties for the years and in the amounts as follows:

| Year | Deficiency | Addition to Tax Sec. 6653(b)(1) | Penalty Sec. 6663 |
|------|-----------|--------------------------------|-------------------|
| 1988 | $30,660 | $22,995 | -- |
| 1989 | 33,549 | -- | $25,162 |
| 1990 | 9,280 | -- | 6,960 |
| 1991 | 37,835 | -- | 28,376 |

The issues to be decided are: (1) Whether petitioner had unreported income for the taxable years in issue as determined by respondent; and (2) whether petitioner is liable for the addition to tax and penalties for fraud.[1]

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and the attached exhibits are incorporated herein by this reference. In addition, petitioner

---

[1] Respondent conceded certain items underlying his reconstruction of petitioner=s taxable income for 1989 and 1991, resulting in a reduction of the deficiencies and fraud penalties as set forth in the notice of deficiency for those years. Because we are unable to discern the specific items that respondent has conceded, the Court=s decision in this case will be entered pursuant to Rule 155 consistent with the Court=s findings in this opinion.

is deemed to have admitted undenied allegations set forth in respondent's requests for admissions. See Rule 90(c). The following facts form the basis for respondent's net worth analysis for the years in issue. At the time the petition was filed, petitioner was incarcerated in Terre Haute, Indiana.

During the years in issue, petitioner received taxable income from the operation of a taxidermy business, rental receipts, and the sale of illegal drugs. In 1994, petitioner was indicted in the U.S. District Court for the Western District of Pennsylvania for various crimes including conspiracy to distribute cocaine between 1986 and August 1994, threatening a special agent of the Internal Revenue Service, using a firearm in the commission of a drug trafficking crime, and four counts of income tax evasion. On March 9, 1995, after entering a plea of guilty to the drug conspiracy count, the weapons charge, and income tax evasion for 1991, petitioner was sentenced to a period of incarceration.

Petitioner was born on May 31, 1964. In 1982, petitioner graduated from Technical Training School, McKees Rocks, Pennsylvania.

Assets/Personal Expenditures

As of December 31, 1986, petitioner owned the following vehicles: A 1973 Chevrolet Corvette, vehicle identification No. (VIN) 16126, for which he had paid $500 in cash; a 1969 Harley

Davidson, VIN H7062, for which he had paid $100 in cash; a 1950 Chevrolet, VIN A5965, for which he had paid $1,700 in cash; a 1982 Harley Davidson, VIN 13307, for which he had paid $1,475; and a 1960 Harley Davidson, VIN H2578, for which he had paid $1,500.

As of January 1, 1987, petitioner had cash on hand of $10,000. As of January 1, 1987, petitioner had no bank or brokerage accounts.

During 1987, petitioner purchased a 1972 GMC pickup, VIN 04714, for which he paid $1,500, and a 1979 Cadillac, VIN 38892, for which he paid $3,750.

During 1988, petitioner purchased a 1986 Boss Trailer, VIN 00257, for which he paid $200, and a 1972 Harley Davidson, VIN 296H2, for which he paid $2,900.

During 1990, petitioner purchased a 1990 Harley Davidson, VIN 09113, for which he paid $18,910.87, and a 1990 Travelite Trailer, for which he paid $3,028.90.

During 1988, petitioner sold the 1982 Harley Davidson, VIN 13307. During 1989, petitioner sold the 1960 Harley Davidson, VIN H2578, and the 1979 Cadillac, VIN 38892. During 1990, petitioner sold the 1950 Chevrolet, VIN A5965.

As of December 31, 1987, 1988, 1989, 1990, and 1991, petitioner owned business equipment with a value (at cost) of $7,170, $7,670, $12,366, $13,359, and $18,078, respectively.

During August 1987, petitioner purchased from Kim C. and Mary P. Hammill a building located at 1939 Babcock Boulevard, Pittsburgh, Pennsylvania (the Babcock building or property). The sale price of the Babcock property was $55,000. In November 1987, petitioner paid $25,000 in cash to Kim C. Hammill in partial payment of the amount due on the Babcock property. The balance of the sale price, $30,000, was the subject of a seller-financed mortgage on the property. Petitioner paid $50 for the recording of the deed and mortgage for the Babcock property, and $300 for Pennsylvania transfer taxes.

As of December 31, 1987, petitioner owed $29,556.95 on the Babcock property. During 1988, petitioner made monthly cash mortgage payments of $396.45 to the Hammills. In September 1988, petitioner used cash to pay off the balance due on the Babcock property.

Petitioner maintained an apartment on the second floor of the Babcock building and operated a taxidermy business, known as the Wilderness Taxidermy Studio (Wilderness Taxidermy), on the first floor of the building.

During 1987, petitioner opened checking account No. 1534-119 in his name at Equibank. As of December 31, 1987, 1988, 1989, 1990, and 1991, petitioner's Equibank checking account had balances of $1,414.53, $909.99, $645.50, $396.24, and $289.76, respectively.

During 1987, petitioner opened checking account No. 555-209-411 in the name of Wilderness Taxidermy at Equibank. As of December 31, 1987, 1988, 1989, 1990, and 1991, Wilderness Taxidermy's Equibank checking account had balances of $2,657.95, $3,750.54, $349.50, $1,600.61, and $113.77, respectively.

During 1987, petitioner opened money market account No. 5607645 in the name of Wilderness Taxidermy at Equibank. As of December 31, 1987, Wilderness Taxidermy's Equibank money market account had a balance of $985.64, with zero balances thereafter.

During 1988, petitioner opened money market account No. 5607653 in his name at Equibank. As of December 31, 1988, petitioner's Equibank money market account had a balance of $3,543.01, with zero balances thereafter.

During 1987, petitioner obtained a certificate of deposit (CD) from Equibank. As of December 31, 1987, December 31, 1988, and November 10, 1989, petitioner's Equibank CD had balances of $2,500, $2,677.57, and $2,806.37, respectively, with zero balances thereafter.

Petitioner continued to own the Babcock building through December 31, 1991. During 1987, 1988, and 1989, petitioner made significant additions and improvements to the Babcock building.

During 1987, petitioner paid $12,500 in cash to Holtz Construction Co. (Holtz) for the purchase and installation of a vinyl window, cedar siding, and trim for the Babcock building.

During 1988, petitioner contracted with Holtz to build a large addition on the Babcock building. Because Holtz planned to relocate out of State, the company prepared a second construction contract naming Ben Corey Building Contractor (Corey) as the contractor to perform the work described under the first contract. The cost of the construction work to be performed under both contracts totaled $162,000. During August and September 1988, petitioner paid $20,000 in cash to Holtz pursuant to the first contract. Holtz retained $15,000 of the $20,000 payment as its fee for completing the building design plans and preparing the contract. Holtz transferred the remaining $5,000 to Corey.

During 1988, petitioner paid a total of $90,825.32 to Corey under the second contract. During 1989, petitioner paid a total of $72,062.64 to Corey under the second contract. Petitioner made a substantial number of payments to Corey in cash.

During 1988, petitioner paid $1,500 to James E. Lignelli for an appraisal of the Babcock property.

During 1988, petitioner paid $547 to Tait Engineering for a survey of the Babcock property.

During 1988, petitioner paid $341 to Ross, Schonder, Sterzinger, Cupcheck, P.C., an architectural engineering firm, for services rendered with respect to the Babcock property.

During 1988, petitioner paid $5,000 to Girty's Run Joint Sewage Authority for a permit to use the sewage system servicing the Babcock building.

During 1988, petitioner paid $6,226.44 to Pool City for the purchase and installation of a hot tub at the Babcock building.

During 1988, petitioner paid $2,625 in cash to Ralph Yunker, Jr., for excavation work at the Babcock property.

During 1989, petitioner paid $1,800 to Ralph Yunker, Jr., for excavation work at the Babcock property, including the digging of ditches for natural gas and water lines.

During 1989, petitioner paid $1,550 to Fiore Glass for the purchase and installation of glass mirrors and a door for the Babcock building.

During 1989, petitioner paid $1,091 to Pittsburgh Glass Block Co. for the purchase and installation of glass block at the Babcock building.

During 1989, petitioner paid $6,323.38 to Steven Novak for the purchase and installation of carpeting and tile at the Babcock building.

During 1989, petitioner paid $11,395 to Roscoe Asphalt Paving Co. to pave the parking lot at the Babcock property.

During 1989, petitioner paid (by cash and checks) a total of $4,036.86 to Gotich Electric Co., Inc., for work performed at the Babcock property.

During 1989, petitioner paid $6,235 to Automatic Door Enterprises, Inc., for the purchase and installation of an automatic electric door at the Babcock building.

During 1989, petitioner paid $5,209.21 in cash to Lighting by Erik for the purchase and installation of light fixtures and bulbs at the Babcock building.

On or about April 19, 1989, petitioner paid $1,700 in cash to John M. Sebbens Painting for work done on the Babcock building.

During 1989, petitioner paid $7,420 to Russell Construction Co. ($996 by check and $6,424 in cash) for the installation of a wooden deck, a lattice, skylights, and a laundry chute at the Babcock building.

During 1989, petitioner paid $4,118 to Alpine Pools for the installation of a hot tub at the Babcock building. During 1989, petitioner paid an additional $930 to Alpine Pools.

During 1989, petitioner paid $382.12 to Allegheny Millwork & Lumber for the installation of a wooden handrail in the Babcock building.

During 1989, petitioner paid $4,000 to Lentz's Heating and Air Conditioning (Lentz's) for the installation of a furnace at the Babcock building. During the same year, petitioner paid $813.91 to Lentz's for the installation of an exhaust fan and an outdoor spa at the Babcock building.

During 1989, petitioner paid $400 to North Hills Stone Co. for a fireplace slate slab.

During 1989, petitioner paid $923 to the Listening Post for the installation of a security system at the Babcock building. During 1990, petitioner paid $251.45 to Lentz's for the installation of an exhaust fan and an outdoor receptacle.

During 1990, petitioner paid $300.75 to Thermal Industries, Inc., for the installation of two windows at the Babcock building.

During 1988, 1989, 1990, and 1991, petitioner paid $3,394.44, $28,787.92, $223, and $3,736.79, respectively, to the Listening Post for various home entertainment products.

On September 21, 1989, petitioner paid $386.76 to Sun Television & Appliances, Inc. (Sun), for merchandise. On September 15 and November 29, 1990, petitioner paid $173.84 and $561.55, respectively, to Sun for merchandise. On July 2 and September 28, 1991, petitioner paid $633.64 and $1,606.71, respectively, to Sun for merchandise.

During 1989, petitioner paid $542.72 in cash to Gas-Lite Manufacturing Co. for merchandise.

During 1989, petitioner paid $3,306.93 in cash to Levin Furniture for bedroom furniture for his apartment at the Babcock building.

During 1989, petitioner paid $1,377.98 to Wickes Furniture for furniture for his apartment at the Babcock building. On November 11, 1989, petitioner paid $50 to Kelly's Delivery Service for the delivery of the furniture that he had purchased from Wickes Furniture.

During 1989, petitioner paid $2,517.50 in cash to West Penn Billiards for a pool table for the Babcock building.

During 1989, 1990, and 1991, petitioner paid $6,122.58, $2,418.90, and $6,334.14, respectively, to Aquatic Interiors for the purchase, installation, and care of two aquariums at the Babcock building.

During 1989, petitioner paid $1,350.71 to Louis Hahn & Son, a flower and garden shop, for the purchase and installation of a small waterfall and aquatic plants at the Babcock building.

During 1989, petitioner paid $430.88 to Vic Polk Studio for art posters.

During 1989, petitioner paid $2,607.13 for shares of stock purchased through the brokerage firm Hibbard, Brown & Co. During 1991, petitioner sold all of the above-referenced stock.

During November 1990, petitioner paid $169 to Pool City for an artificial Christmas tree.

During 1991, petitioner paid $741 to Peter Berger for a Motorola Flip cellular telephone.

During 1991, petitioner paid a total of $472.75 to Laser Devices, Inc., for merchandise for his residence.

During 1991, petitioner paid $1,363.61 to Pittsburgh Florist for the installation and maintenance of shrubbery and plants at the Babcock building.

In May 1991, petitioner purchased a Rinker boat from Chet Aleks Yamaha & Marine (Chet Aleks). The purchase price of the Rinker boat, including sales tax, document preparation fees, registration fees, and a temporary license fee totaled $66,819.

Joseph C. and Bertha M. Piole are petitioner's parents. Before purchasing the Rinker boat, petitioner transferred $19,000 in cash to his parents' checking account. On May 10, 1991, M. Richard Mellon (Mellon), an attorney who was assisting petitioner in the purchase of the boat, tendered to Chet Aleks a check in the amount of $6,300, representing petitioner's downpayment on the boat. On or about May 13, 1991, petitioner paid Chet Aleks a total of $61,519, consisting of $7,019 in cash, petitioner's check in the amount of $11,500, Wilderness Taxidermy's check in the amount of $16,500, a check in the amount of $19,000 made payable to Chet Aleks and drawn on his parents' account, and a check in the amount of $7,500 made payable to Chet Aleks drawn on Mellon's account. Petitioner subsequently reimbursed Mellon by giving him $7,500 in cash. Chet Aleks applied $60,519 of the $61,519 to pay off the balance due on the Rinker boat. Chet

Aleks applied the remaining $1,000 to cover the cost of life preservers, ropes, a boat cover, and an anchor that petitioner had purchased for the boat. During 1991, petitioner paid $299.72 to Chet Aleks for additional boat accessories.

In May 1989, petitioner and his parents organized a corporation known as Joe's Laundromat, Inc. (Joe's), to operate a laundromat at the Babcock building. Joe's paid rent to petitioner at the rate of $1,250 per month. Petitioner was the manager of the corporation, petitioner's father served as president, and petitioner's mother served as secretary/treasurer. In 1991, petitioner became president of the corporation. Petitioner kept the books and records of the corporation. Petitioner made loans to Joe's. As of December 31, 1989, 1990, and 1991, Joe's owed petitioner $30,637.90, $25,331.81, and $13,726.23, respectively, on those loans.

Petitioner took many pleasure trips and stayed at various hotels and motels during 1990 and 1991. During 1990, petitioner booked round-trip air transportation through Travel Planners International, Inc. (Travel Planners), from Pittsburgh to: Amsterdam, Holland; Fort Lauderdale, Florida; Memphis, Tennessee; Rapid City, South Dakota; New Orleans, Louisiana; and two trips to Fort Myers, Florida. During 1990, petitioner paid $2,885 to Travel Planners for the aforementioned trips.

During 1990, petitioner paid $479.60 in cash to Sea Chateau,

a motel located in Fort Lauderdale, Florida, for a stay from January 21 through 29, 1990.

During 1990, petitioner paid $31.80 to Trails End Motel in Naples, Florida, for an overnight stay on September 24, 1990.

During 1990, petitioner paid $203.52 to the Vanderbilt Beach Motel, in Naples, Florida, for a stay from September 25 through October 1, 1990. In November 1990, petitioner paid $100 to Vanderbilt Beach Motel for a planned stay in January 1991.

During 1990, petitioner booked round-trip air transportation from Pittsburgh to Holland through Go Go Tours & Travel Planners International (Go Go Tours). During 1990, petitioner paid $500 to Go Go Tours.

During 1991, petitioner booked round-trip air transportation through Travel Planners from Pittsburgh to: Los Angeles, California; Kansas City, Missouri; Naples, Florida; Toronto/Sudbury, Canada; Orofino, Idaho; and Fort Myers, Florida. During 1991, petitioner paid $5,228.98 to Travel Planners for these trips.

In April 1991, petitioner paid $1,014 to US Airways for round-trip airfares from Pittsburgh to Los Angeles for himself and three companions.

During 1991, petitioner paid $733.09 to Marina Pacific, a hotel in Venice, California, for a stay from April 4 through 15, 1991.

During 1991, petitioner paid $368 to Northwest Airlines for round-trip airfare between Pittsburgh and Detroit, Michigan. Petitioner subsequently exchanged this ticket for a ticket to Lewistown, Idaho.  During his trip to Idaho, petitioner paid $16.54 for a one-night stay at Helgesin Place in Orofino, Idaho. Petitioner's trip to Idaho included a hunting expedition organized by Moose Creek Outfitters.  During 1991, petitioner paid $2,250 to Moose Creek Outfitters for the hunting expedition. Petitioner paid $204.75 to Orofino Aviation, Inc., for transportation during the hunting trip.  In connection with the hunting trip, petitioner paid $92 to the State of Idaho for various nonresident hunting licenses and a fine of $240 for violating Idaho law by shooting, but not tagging, a bull moose.

During August and November of 1991, petitioner stayed at the Marco Bay Resort, Marco Island, Florida.  During 1991, petitioner paid $468.80 to Marco Bay Resort for the two stays.  During 1991, petitioner paid $560.55 in cash to Affordable Limousine Service, Inc., for the rental of a limousine while in Marco Island, Florida.

During 1991, petitioner paid $385.74 to the Vanderbilt Beach Motel, in Naples, Florida, for two separate stays in January and November 1991.

During 1991, petitioner paid $1,590 to A-Bear Charter Service of Florida for chartered ocean fishing trips.

During 1991, petitioner paid $80.85 to Scott's Motel in Erie, Pennsylvania, for a stay in March 1991.

During 1991, petitioner paid $622.40 to the Hyatt Regency Allicante.

During September 1991, petitioner paid $478.30 to the Pittsburgh Hilton.

During 1991, petitioner, through his girlfriend, Leigh Ann Mulig, paid $9,197.42 to attorneys in Canada for legal representation provided to petitioner.

On or about March 5, 1988, petitioner paid $485 in cash to Lowry Western Shop for two pairs of boots and a pair of work shoes.

During 1988, 1989, 1990 and 1991, petitioner paid $650, $224.95, $349.95, and $150.58, respectively, to Jim & Chuck's Boot Shop for boots and gift certificates.

During 1988, 1989, 1990, and 1991, petitioner paid $200, $611, $3,231.60, and $600, respectively, to Jeff Critchlow Auto Body for repair and maintenance work on petitioner's various vehicles.

During 1988, 1989, 1990, and 1991, petitioner paid $500, $500, $1,250, and $1,116, respectively, to Carl Marcus, an attorney, for legal services.

During 1991, petitioner paid $1,000 to Mellon for legal services.

During 1989, 1990, and 1991, petitioner paid $154.71, $1,350.23, and $365.31, respectively, to J-J-D Service for repair and maintenance work on petitioner's various vehicles.

During 1989, petitioner paid $524.70 to Weigand Brothers Transmission Service for transmission work on his GMC pickup. During 1990, petitioner paid $113.95 to Weigand Brothers Transmission Service for transmission work on his 1973 Chevrolet Corvette.

During each of the years 1989, 1990, and 1991, petitioner paid $450 to Edward Brazier for the rental of a garage which petitioner used to store his motorcycles.

During 1990, petitioner paid $597.80 to State Farm Insurance Co. for insurance coverage on one of his motorcycles. During 1991, petitioner paid $2,830.13 to State Farm Insurance Co. for insurance coverage on a motorcycle, the 1973 Chevrolet Corvette, the 1972 GMC pickup, the 1990 Travelite Trailer, and the Rinker boat.

In January 1990, petitioner paid $40 to Pool City for a service call.

During 1990, petitioner paid $746.35 in cash to Guy R. Palermo Auto Body for repainting one of petitioner's motorcycles.

During 1991, petitioner paid $399.25 to Street Sweeper, Inc., of Atlanta, Georgia, for the purchase of a firearm.

During 1991, petitioner paid a total of $1,000 to Doc of the Bay Marina for dock space for the Rinker boat.

During 1991, petitioner paid $87.13 to Lighting by Erik for light bulbs and parts.

During the years in issue, petitioner paid for food, clothing, telephone, gas, and electric service.

Liabilities

Petitioner incurred various liabilities during the period in question (in addition to the aforementioned mortgage on the Babcock property). During 1981, petitioner obtained an education loan of $2,500. As of December 31, 1987, the outstanding principal balance on the education loan was $2,500. During 1988, petitioner paid off the principal amount of the loan and $226.20 in accumulated interest.

During 1988, petitioner obtained a loan (account No. 5882253) from Equibank. Pursuant to the loan agreement, Equibank released cash to petitioner in the amounts and on the dates as follows:

| Date | Amount |
| --- | --- |
| Oct. 11, 1988 | $10,000 |
| Nov. 2, 1988 | 20,000 |
| Nov. 16, 1988 | 20,000 |
| Nov. 23, 1988 | 20,000 |
| Jan. 10, 1989 | 20,000 |
| June 5, 1989 | 10,000 |

As of December 31, 1988, 1989, 1990, and 1991, the outstanding

balances on the above-referenced loan were $70,000, $95,917.38, $87,978.67, and $79,177.29, respectively.

During March 1989, petitioner obtained a second loan from Equibank (also assigned account No. 5882253). Pursuant to the second loan agreement, Equibank released cash to petitioner in the amounts and on the dates as follows:

| Date | Amount |
|------|--------|
| Mar. 17, 1989 | $10,000 |
| Mar. 20, 1989 | 5,000 |
| Mar. 31, 1989 | 5,000 |
| Apr. 11, 1989 | 18,000 |
| Apr. 13, 1989 | 7,000 |

As of December 31, 1989, 1990, and 1991, the outstanding balances on the above-referenced loan were $44,498.61, $40,732.84, and $36,572.29, respectively.

Petitioner's purchase of the aforementioned 1990 Harley Davidson (VIN 09113) was financed through a vehicle loan (account No. 5409023) from Pittsburgh National Bank. As of December 31, 1990 and 1991, the outstanding balances on account No. 5409023 were $15,483.06 and $11,902.07, respectively.

Petitioner maintained credit card accounts with Discover Card, First Card, Colonial National Bank, and Bank One. As of December 31, 1989, 1990, and 1991, the Bank One account had outstanding balances of $1,835.44 and $810.69, and a credit of $16.41, respectively. As of December 31, 1991, the outstanding balances on the Discover Card and First Card accounts were $28.69

and $64.87, respectively. Petitioner did not have any end-of-year balances on the Colonial National Bank card.

As of December 31, 1987, 1988, 1989, 1990, and 1991, Wilderness Taxidermy had accumulated depreciation balances of $1,504.87, $4,204.87, $7,529.87, $11,511.87, and $15,288.87, respectively.

Petitioner's purchase of the aforementioned hot tub from Pool City was financed with a loan from Commercial Credit Corp. (Commercial Credit). As of December 31, 1988 and 1989, the outstanding balances on the Commercial Credit loan were $4,820.89 and $2,476.72, respectively. Petitioner paid off the Commercial Credit loan in full during 1990.

During 1988, petitioner obtained a loan of $3,034.20 from Manufacturers Hanover Consumer Discount Co. (Manufacturers Hanover). As of December 31, 1988 and 1989, the outstanding balances on the Manufacturers Hanover loan were $3,034.20 and $252.85, respectively. Petitioner paid off the Manufacturers Hanover loan in full during 1990.

During 1987 and 1988, petitioner paid $4,200 and $2,800 in cash, respectively, to Hubert Zelina for the rent on an apartment. Petitioner was evicted from the apartment after failing to pay rent for September, October, and November 1988. Petitioner was sued for back rent and for damaging the apartment.

During 1990, petitioner paid $1,366.32 to Hubert Zelina in settlement of the suit.

During 1987, 1988, and 1990, petitioner paid State sales tax and title and registration fees of $97.00, $55.50, and $1,416.38, respectively.

Pursuant to orders issued by courts of competent jurisdiction, petitioner was required to make support payments to two children, Jessica Piole and Sarah Ayres Slanina. During 1987, 1988, 1989, and 1991, petitioner paid $75, $475, $425, and $637.50, respectively, in support payments for Jessica Piole. During 1988, 1989, and 1990, petitioner paid $2,600.00, $1,437.50, and $15,000, respectively, in support payments for Sarah Ayres Slanina.

During 1988 and 1989, petitioner paid $3,312.50 and $957.50, respectively, to Equibank for settlement charges arising from various loans.

During 1989, petitioner retained Bedway Security Agency, Inc., to provide services with respect to a civil court action. During 1989, petitioner paid $316 to Bedway Security Agency, Inc., for its services.

During 1990, petitioner paid $350 to Spirit Harley Davidson for repair and restorative work on several of his motorcycles. After a dispute arose between petitioner and Spirit Harley Davidson as to the cost of said work, Spirit Harley Davidson

filed a civil suit against petitioner seeking payment. During 1991, petitioner paid $3,952.90 to Spirit Harley Davidson in settlement of the suit.

Nontaxable Sources of Income

During 1987, petitioner received welfare benefits of $3,224. Petitioner did not receive any welfare benefits during 1988, 1989, 1990, or 1991.

During 1988, 1989, and 1991, petitioner received insurance proceeds in the amounts of $172.28, $1,829.99, and $2,595.10, respectively. Petitioner did not receive any insurance proceeds during 1987 and 1990.

Petitioner's Tax Returns

Petitioner used the calendar year for tax reporting and the cash method of accounting. Petitioner's Federal income tax returns for 1987, 1988, 1989, 1990, and 1991 were prepared by paid return preparers. Petitioner did not keep books and records of his illegal drug sales during the years in issue. Petitioner did not inform his return preparers of the income that he derived from illegal drug sales, and he failed to report such income on his Federal income tax returns for the years in issue.

The tax return that petitioner filed for 1987 reflects a Schedule C, Profit or Loss From Business, loss of $3,608.85, rental income of $595.50, and taxable income of zero. The tax return that petitioner filed for 1988 reflects a Schedule C loss

of $7,511, rental loss of $663, and taxable income of zero. The tax return that petitioner filed for 1989 reflects a Schedule C loss of $8,202, rental loss of $3,632, and taxable income of zero. The tax return that petitioner filed for 1990 reflects a Schedule C loss of $15,881, rental income of $2,121, and taxable income of zero. The tax return that petitioner filed for 1991 reflects a Schedule C loss of $3,794, rental income of $4,360, and taxable income of zero.

Contrary to the income that petitioner reported on the tax returns that he filed for the years in issue, petitioner submitted financial statements and tax returns to various financial institutions in support of loan applications reflecting substantial taxable income. On or about August 27, 1988, petitioner submitted to Equibank a financial statement in support of his application for a loan listing assets of $249,600, liabilities of $700, net worth of $248,900, and gross income of $38,150. On or about March 13, 1989, petitioner submitted to Equibank a financial statement in support of his application for a loan listing assets of $249,600, liabilities of $1,000, and net income of $87,542. On or about May 3, 1991, petitioner submitted to Colonial National Bank an application for a MasterCard credit card listing his income as $140,000.

When petitioner applied for loans at Equibank and Commercial Credit Corp., he submitted signed copies of Federal income tax

returns that he had purportedly filed for the years 1985, 1986, 1987, and 1988. The tax return for 1987 shows Schedule C income of $42,671.50, rental income of $4,800, and total income of $47,541.50. The tax return for 1988 shows Schedule C income of $33,653, rental income of $5,000, and total income of $38,653.

Petitioner understated his taxable income for the years 1988, 1989, 1990, and 1991. Petitioner's failure to report such taxable income resulted in underpayments of tax in each of those years. Petitioner is liable for self-employment taxes on his unreported income for each of those years. A part of petitioner's underpayment of tax for each of the years 1988, 1989, 1990, and 1991 was due to fraud.

OPINION

Petitioner's Motion To Seal The Record

At the commencement of the trial in this case, petitioner orally moved to seal the record. There being no objection from respondent, the Court conditionally granted petitioner's motion. In particular, by order dated May 22, 2000, the Court directed petitioner to identify the particular evidence in the record that should not be disclosed to the public. Petitioner failed to comply with the Court's order.

Section 7458, which governs hearings before the Tax Court, provides that such hearings shall be open to the public. In addition, section 7461, provides in pertinent part:

SEC. 7461.  PUBLICITY OF PROCEEDINGS.

(a)  General Rule.--Except as provided in subsection (b), all  reports of the Tax Court and all evidence received by the Tax Court and its divisions, including a transcript of the stenographic report of the hearings, shall be public records open to the inspection of the public.

(b)  Exceptions.--

(1) Trade secrets or other confidential information.--The Tax Court may make any provision which is necessary to prevent the disclosure of trade secrets or other confidential information, including a provision that any document or information be placed under seal to be opened only as directed by the court.

Rule 103 provides that upon motion by a party or other affected person, and upon good cause shown, the Court may make any order which justice requires to protect a party or other person from annoyance, embarrassment, oppression, or undue burden or expense.

Sections 7458 and 7461 reflect the well-established principle that official proceedings and records of all courts, including the Tax Court, generally shall be open and available to the public.  See Nixon v. Warner Communications, Inc., 435 U.S. 589, 597 (1978); Willie Nelson Music Co. v. Commissioner, 85 T.C. 914, 917 (1985).  However, section 7461 and Rule 103 provide that the Court has the discretionary authority to order all or part of a record to be sealed where such action is necessary to protect trade secrets and confidential information or to avoid annoyance, embarrassment, oppression, or undue burden or expense.  See

Willie Nelson Music Co. v. Commissioner, supra at 918-919, and cases cited therein.

In resolving whether a permanent protective order sealing a portion of the evidentiary record is warranted in this case, we must weigh the public's interest in free and open access to Tax Court proceedings against petitioner's individual interests. Nixon v. Warner Communications, Inc., supra at 602. The public's interest in open judicial proceedings is presumed to be paramount to the interests of an individual seeking to close the proceedings in that open proceedings allow the public an opportunity to understand the underlying dispute and its disposition, thereby enhancing public confidence in our system of taxation. Willie Nelson Music Co. v. Commissioner, supra at 919.

As previously discussed, petitioner failed to identify the particular documents or information that he contends should not be disclosed to the public. Under the circumstances, we conclude that the Court's earlier protective order sealing the record in this case has served its purpose and that the public's interest in open proceedings outweighs any continuing individual interests at stake herein. Accordingly, we will vacate the protective order dated May 22, 2000.

Deficiencies

Petitioner failed to maintain adequate books and records as required by section 6001.  Accordingly, respondent relied on the net worth method as a means to indirectly reconstruct petitioner's income for the years in issue.  See Holland v. United States, 348 U.S. 121 (1954); Goodmon v. Commissioner, 761 F.2d 1522, 1524 (11th Cir. 1985); Cupp v. Commissioner, 65 T.C. 68, 82 (1975), affd. without published opinion 559 F.2d 1207 (3d Cir. 1977).  From our examination of respondent's net worth calculations, we are satisfied that these calculations comport with the requirements of Holland v. United States, supra.  In particular, respondent made adequate opening cash-on-hand computations, established a likely source of income, and investigated relevant leads of nontaxable sources of income.  See id. at 130-131.  Respondent's net worth calculations were based on substantial documentary evidence.  Moreover, petitioner has stipulated or is deemed to have admitted many if not all of the adjustments underlying respondent's determinations.  Petitioner bears the burden of proving that respondent's determinations are incorrect.  See Parks v. Commissioner, 94 T.C. 654, 658-659 (1990); Schad v. Commissioner, 87 T.C. 609, 620 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987).

Petitioner failed to offer any credible evidence that respondent's determinations are erroneous.  At trial, petitioner

attempted to challenge various matters that were deemed admitted under Rule 90(c). In particular, petitioner testified that: (1) The purchase price of the Babcock property was only $30,000 (as opposed to the $55,000 determined by respondent); (2) the improvements to the Babcock property cost only $103,000 (as opposed to the $162,000 determined by respondent); (3) his parents paid $15,000 of his child-support obligation in 1990; and (4) his parents paid a substantial portion of the purchase price of the Rinker boat.

Petitioner's testimony at trial lacked credibility and was contradicted by respondent's witness, Special Agent Gary Makovsky. On the basis of our review of the entire record herein, we find petitioner's assertions to be contrived and unpersuasive.

Respondent also determined that petitioner is liable for the addition to tax for fraud for the taxable year 1988 and the fraud penalty for the taxable years 1989, 1990, and 1991. Respondent must prove fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b); Rowlee v. Commissioner, 80 T.C. 1111, 1123 (1983).

Fraud requires a showing that the taxpayer intended to evade a tax known or believed to be owing. See Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968). The existence of fraud is a question of fact. See Gajewski v. Commissioner, 67

T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is never presumed or imputed; it must be established by independent evidence that establishes a fraudulent intent on the taxpayer's part. See Otsuki v. Commissioner, 53 T.C. 96, 106 (1969). Because direct proof of a taxpayer's intent is rarely available, fraud may be proven by circumstantial evidence, and reasonable inferences may be drawn from the relevant facts. See Spies v. United States, 317 U.S. 492, 499 (1943); Stephenson v. Commissioner, 79 T.C. 995, 1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984). For example, an intent to conceal or mislead may be inferred from a pattern of conduct, see Spies v. United States, supra at 499, or from a taxpayer's entire course of conduct, see Stone v. Commissioner, 56 T.C. 213, 223-224 (1971). Likewise, a pattern showing a consistent underreporting of income, when accompanied by circumstances evidencing an intent to conceal, may justify a strong inference of fraud. See Parks v. Commissioner, supra at 664.

We often rely on certain indicia of fraud in deciding the existence of fraud. The presence of several indicia is persuasive circumstantial evidence of fraud. See Beaver v. Commissioner, 55 T.C. 85, 93 (1970). The "badges of fraud" include: (1) The filing of false documents; (2) understatement

of income; (3) maintenance of inadequate records; (4) implausible or inconsistent explanations of behavior; (5) concealment of assets; (6) failure to cooperate with tax authorities; (7) engaging in an illegal activity; (8) attempting to conceal such activity; (9) dealing in cash; and (10) failing to make estimated tax payments. See Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Petzoldt v. Commissioner, 92 T.C. 661, 700 (1989).

On the basis of our review of the entire record, we hold that respondent has met his burden of proving fraud. As previously discussed, respondent's reconstruction of petitioner's income for the years in issue reveals that petitioner underpaid his taxes for 1988, 1989, 1990, and 1991. Further, each such underpayment was attributable to fraud. Petitioner engaged in illegal drug sales, established a clear pattern of underreporting taxable income from 1988 through 1991, failed to maintain adequate records of his income, and engaged in substantial cash transactions. In sum, petitioner's conduct supports a particularly strong inference of fraud. See Parks v. Commissioner, supra at 664. Equally significant, petitioner pleaded guilty to criminal tax evasion for 1991. See Petzoldt v. Commissioner, supra at 701-702. Considering all the facts and circumstances, we hold that petitioner is liable for the addition to tax for fraud for 1988 and the fraud penalty for 1989, 1990, and 1991.

To reflect the foregoing,

An appropriate order will be issued, and decision will be entered under Rule 155.